[No. F053389. Fifth Dist. Nov. 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR LOPEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of parts 1. through 7.

### COUNSEL

A. M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant Victor Lopez.

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Barajas.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Brian Alvarez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**GOMES, J.**—On the evening of August 24, 2003, a car carrying two Sureños criminal street gang members—Victor Lopez, the driver, and Antonio Barajas, the passenger—stopped inside a gang-infested alley in a high-crime Modesto neighborhood. Eric Adorno, standing next to a van with a red bandanna on the steering column and wearing a red jersey, blue jeans, and red and white shoes, walked up to the car. A bullet fired from the passenger side of the car struck Adorno between the eyebrows and killed him. Police observed a red baseball cap on the ground near his head. Red is the color commonly associated with the Norteños criminal street gang.

A jury found Barajas and Lopez guilty of first degree murder, found criminal street gang allegations true as to both, and found true as to Barajas an allegation of personal and intentional discharge of a firearm causing death. (Pen. Code, §§ 187, subd. (a), 186.22, subd. (b)(1), 12022.53, subd. (d).)[1] The trial court sentenced Barajas to 50 years to life (25 years to life for first

---

[1] Later statutory citations are to the Penal Code except where otherwise noted.

degree murder and 25 years to life consecutively for the firearm enhancement) and sentenced Lopez to 25 years to life for first degree murder.

## ISSUES ON APPEAL

Nine issues arise on appeal. Two are evidentiary. Barajas and Lopez (1) argue insufficiency of the evidence that the Sureños were a criminal street gang and (2) characterize as prejudicial error the trial court's ruling that a university sociology professor could not testify that gang culture would have prevented premeditation and instead given rise to an actual belief in the need for self-defense.

Three issues challenge jury instructions. Lopez argues (3) the trial court's instructing with CALCRIM No. 355 on a defendant's right not to testify without modifying the instruction to reflect his testifying in his own defense impermissibly lowered the prosecution's burden of proof. Barajas and Lopez argue (4) that CALCRIM No. 521 erroneously conflated the elements of first degree murder and impermissibly lowered the prosecution's burden of proof by precluding the possibility of a second degree murder verdict and (5) that the trial court's rereading of certain instructions was a prejudicially inadequate response to the jury's request for clarification.

Additionally, Barajas and Lopez argue (6) that the section 1203.11 emergency medical services restitution fines which the statute authorizes solely "as a condition of probation," must be stricken from the judgments since neither Barajas nor Lopez received a grant of probation and (7) that cumulative error requires reversal of the judgments. Finally, Lopez (8) argues that his deputy public defender's representation of him after the disclosure of a prosecution witness's prior representation by her office was a conflict of interest and (9) challenges the trial court's denial of his midtrial *Marsden*[2] motion as "not timely."

As to both judgments, we will remand with directions to the trial court to strike the section 1203.11 restitution fines. Otherwise we will affirm Barajas's judgment. With reference to Lopez's judgment, we will reverse and remand with directions to the trial court to conduct a posttrial *Marsden* hearing and to exercise judicial discretion to order a new trial, to reinstate the judgment, or to proceed otherwise as authorized by law.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*).

## DISCUSSION

1.–7.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 8. *Lopez: Conflict of Interest*

Lopez argues that his deputy public defender's representation of him after the disclosure of a prosecution witness's prior representation by her office was a conflict of interest. The Attorney General argues the contrary.

On May 11, 2007, day 26 of the 42-day jury trial, Lopez's attorney and one of her colleagues from the public defender's office appeared in court. Her colleague said he had learned just days earlier that his office had represented prospective witness Carlos Chavez on an escape prior but that nowhere in the case management system that the district attorney's office and the public defender's office shared did Chavez "show up as a witness in this case." As to "whether or not we have a conflict," her colleague said that they "know nothing about that conviction other than that there is a conviction" and that neither he nor she had spoken about Lopez's case with the former deputy public defender who had represented Chavez on the escape prior.

The trial court inquired whether the public defender's office intended to declare a conflict if the prosecutor were to call Chavez as a witness. Lopez's attorney and her colleague both requested a continuance to investigate and to confer with the county public defender. With the concurrence of the prosecutor and Chavez's attorney, the trial court put the matter over to the following week.

On May 16, 2007, day 28 of the 42-day jury trial, the trial court and half a dozen attorneys—Lopez's attorney, her colleague, the county public defender, the prosecutor, Barajas's attorney, and Chavez's attorney—discussed the circumstances under which Chavez might testify. Chavez's attorney expressed his client's willingness to waive any conflict of interest arising from his prior representation by the public defender's office and to testify for the prosecution if he were to receive use immunity, transactional immunity, and a release from custody. The prosecutor agreed to all three conditions. Chavez's attorney noted parenthetically that "obviously, there's another side that has to waive also," but the trial court replied, "I don't know that. I'm just trying to find out what you want to do. Then we'll talk to everybody else to see what they want to do." After the trial court inquired, "So are there any other

[*]See footnote, *ante*, page 801.

conflict issues anybody wants to waive then before we proceed tomorrow?" Lopez's attorney responded:

"[LOPEZ'S ATTORNEY]: Mr. Lopez has informed us that he does not intend to waive the conflict.

"THE COURT: Well, I haven't heard that there's a conflict.

"[LOPEZ'S ATTORNEY]: He believes that there is.

"THE COURT: Well, I need to hear that, though, from the attorney. I don't generally take the client's word that there's a conflict, and if the attorney doesn't tell me anything, I'm taking that at face value.

"[LOPEZ'S ATTORNEY]: He believes there's a conflict because of our former representation of Mr. Chavez in both Juvenile Court and in the adult Superior Court and, apparently, we represented him and appeared with him as recently as April of this year.

"THE COURT: Do you want to put anything factually on the record about that?

"[LOPEZ'S ATTORNEY]: Well, I can't. When this issue first arose, I contacted [the county public defender] wanting initially to set up an appointment for [my colleague] and I to speak to [the county public defender]. As it turns out, he was getting ready to leave the office; I was calling from the Court. So as an alternative, he asked me to explain the situation, which I did, and there was some—a questioning and answering passed between us, and when I finished providing a recitation of the facts, as I understood them, he opined there was no conflict.

"THE COURT: 'He' being [the county public defender]?

"[LOPEZ'S ATTORNEY]: 'He' being [the county public defender]."

After citing a journal article and a case on the issue of waiver, Lopez's attorney told the trial court that the county public defender "instructed me not to read the Chavez file, to not speak with [the former deputy public defender] who, we understand, represented him in the escape case" on which he was in custody. Noting for the record the presence of Lopez's attorney, her colleague, and the county public defender, the trial court asked, "Does anybody think that there's a conflict, any of the three of you think there's a conflict, then?" Lopez's attorney added, "There was one other thing I forgot to say. He

specifically directed that we not declare the conflict. With that in mind, on some level at least, it doesn't matter what I think about the conflict."

Once the county public defender put his position on the record, the trial court quickly resolved the issue against Lopez:

"THE COURT: Well, what is the public defender position? Let me just put it that way.

"[COUNTY PUBLIC DEFENDER]: Your Honor, I will articulate that for you. I think there is no conflict in this case. I have looked at the [case Lopez's attorney cited]; I've researched the law. I have no information nor even a hint of information that we received anything confidential from Mr.—I think Chavez—the potential witness, in our prior representation of him. We certainly won't and don't intend to undertake further representation of him should his case come on calendar for apparently some kind of sentence modification or custody terms' modification; that would be up to [Chavez's attorney]. And in light of that, I see no conflict of interest.

"THE COURT: Okay. Good. So it looks like then we can be back here tomorrow morning at 9:30 with Mr. Chavez."

Chavez testified that just minutes after Barajas and Lopez showed up at the house where he and others were "kickin' back" shortly before the homicide Barajas said there were "busters in the alley" so he "wanted to go check it out," "pull a job," and "go beat the busters in the alley." Chavez testified that "busters" were members of the opposite gang and that "pulling a job" probably meant "go fight with them." Minutes after Barajas and Lopez took off together, Chavez heard a single gunshot. When Barajas and Lopez came back to the house a few hours later, Chavez asked Barajas "what had happened and he said that somebody had got shot." About a week later, Chavez asked Barajas if he had shot the person in the alley. Barajas said, "Yeah. Don't trip. Don't worry about it."

Impeached on cross-examination, Chavez acknowledged that he was in custody, that he had recent convictions of auto theft and escape from jail, and that he had five months left to serve. He testified only after the district attorney agreed not to prosecute him for the homicide and let him serve out his sentence on electronic home monitoring due to a death threat he received in county jail.

With commendable candor, Lopez acknowledges that no United States Supreme Court case is on point, that California case law fails to support his argument (see, e.g., *People v. Cox* (2003) 30 Cal.4th 916, 948–951

[135 Cal.Rptr.2d 272, 70 P.3d 277] (*Cox*); *People v. Clark* (1993) 5 Cal.4th 950, 1001–1002 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*); *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1581 [45 Cal.Rptr.3d 464] (*Rhaburn*)), and that our duty as an intermediate appellate court is to follow the decisional law of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]). Here, as in *Cox, Clark*, and *Rhaburn* alike, ample indicia of the *absence* of a conflict of interest are in the record. For example, Lopez's attorney never represented Chavez or possessed any confidential information about him. Nor, insofar as the county public defender was aware, did anyone in the office ever receive anything confidential from Chavez. In addition, the county public defender carefully instructed Lopez's attorney not to read Chavez's file and not to speak with the deputy public defender who represented Chavez before leaving the public defender's office.

In the absence of any support in California case law, Lopez relies on a State Bar opinion and on a State Bar rule of professional conduct. In his words, the crux of the State Bar opinion is "that the entire public defender's office should be disqualified from representing a defendant if a previous client is also involved in the case as a potential witness." Quite to the contrary, the State Bar opinion addresses the far narrower issue of "whether an attorney may represent a client in the common situation which occurs in public defender offices" not only "when a new client's case involves activities of a former client of the public defender" but also when "*the proposed client has been arrested as the result of the cooperation of a former client with law enforcement agents.*" (State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 1980-52, italics added.) Nothing in the record here shows, let alone intimates, Chavez's cooperation with law enforcement agents in Lopez's arrest.

Indeed, as the State Bar opinion digest carefully notes, "It is improper for counsel in a criminal case to represent a defendant where a previous client of that attorney's office is a witness against the new client *and it is reasonably foreseeable that the confidences or secrets of the former client may be, or reasonably appear to the client to be, used.*" (State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 1980-52, italics added.) Here, since no showing is in the record that the public defender's office ever received anything confidential from Chavez, no issue arises about either the reasonable foreseeability or the reasonable appearance of its use.

The State Bar rule of professional conduct on which Lopez relies states, "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the

member has obtained *confidential information material* to the employment." (Rules Prof. Conduct, rule 3-310(E), italics added.)[8] First, no showing is in the record that Lopez's attorney obtained any confidential information from Chavez. Second, a justification "for declining to apply a rigid presumption [of possession of confidential information]" in the context of representation by the public defender's office "is that '[u]nlike their private sector counterparts, public sector lawyers do not have a financial interest in the matters on which they work' " so " 'they may have less, if any, incentive to breach client confidences.' " (*Rhaburn, supra,* 140 Cal.App.4th at p. 1579.) Third, since Lopez's attorney never had "a 'direct and personal' relationship" with Chavez, whom a former colleague no longer with the public defender's office once represented, "the courts should normally be prepared to accept the representation of counsel, as an officer of the court, that he or she has not in fact come into possession of any confidential information acquired from the witness and will not seek to do so." (*Id.* at p. 1581.) Lopez's reliance on the State Bar rule, like his reliance on the State Bar opinion, is misplaced.

■ To obtain relief on appeal, the defendant must show either an actual conflict that adversely affected counsel's performance (*People v. Lawley* (2002) 27 Cal.4th 102, 146 [115 Cal.Rptr.2d 614, 38 P.3d 461]) or informed speculation with a factual basis in the record about a potential conflict that adversely affected counsel's performance (*People v. Roldan* (2005) 35 Cal.4th 646, 674 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*)) and an abuse of discretion by the trial court in denying his or her motion to disqualify counsel (*Rhaburn, supra,* 140 Cal.App.4th at p. 1573). Since none appears here, Lopez fails to discharge his burden on appeal. With candor equally commendable as before, he acknowledges that the goal of his conflict of interest argument is "to obtain consideration of this issue in this Court and to preserve the issue for reconsideration in the California Supreme Court and for federal review." Duly noted.

### 9. *Lopez: Midtrial* Marsden *Motion*

Lopez challenges the court's denial of his midtrial *Marsden* motion as "not timely." The Attorney General agrees that the denial of Lopez's *Marsden* motion on that ground was error but argues harmless error.

The history of Lopez's midtrial *Marsden* motion commences with three pretrial in camera *Marsden* hearings, at each of which he sought a substitution of attorneys on the ground of a conflict of interest with the public defender's office. At his first *Marsden* hearing, on September 14, 2005, he

---

[8] Lopez cites rule 3-310(D), but paraphrases the content of rule 3-310(E), of the California Rules of Professional Conduct. So as not to elevate form over substance, we construe his argument as relying on the latter.

informed the trial court that he had "witnesses on my case that have arrest histories and I tried to find out if there was a conflict in our case, if they were being represented by the public defender's office at one time or another. They refused to tell me." He added, "There's witnesses, even codefendants, that have arrest histories too." The trial court asked, "But you didn't get the criminal histories or the arrest histories of the witnesses?" He replied, "I didn't want the arrest histories, I just wanted to know if they were represented at one time or another."

Asked by the trial court to address Lopez's concerns, his attorney, noting that she had represented him continuously since he was taken into custody two years earlier, distinguished her responsibility to do conflict checks from the county public defender's responsibility to declare conflicts: "One of the first things that I did after we'd been assigned the case was to review the police reports. Not only for content, but to identify potential witnesses and do conflicts checks. And that review did not show any of the conflicts that my supervisor would accept. [¶] So [even if] we might, for example have represented some of these people in misdemeanors years ago, [the county public defender] would not approve declaring a conflict on former clients unless there was something very special about the situation. [¶] So I explained that to Mr. Lopez." She said that "the only thing that Mr. Lopez wanted us to investigate for him" was to "interview the girlfriend" and prepare a report and that the public defender's investigator did so. Finding she had "properly checked for conflicts, properly investigated it, [and] properly kept [Lopez] advised," the trial court denied his motion.

At Lopez's second *Marsden* hearing, on September 22, 2005, his attorney said she had found out just the day before that a colleague of hers in the public defender's office and her colleague's former "three strikes" client "had attempted to negotiate a deal" with the district attorney's office calling for the client to testify against Lopez to "get a better deal for himself." Private counsel later substituted in for her colleague.

Lopez's attorney said the county public defender "specifically" instructed her she "was not authorized to withdraw from this case" but "should convey" to Lopez "all of the information" she had "about the situation." She said private counsel refused to let her talk with her colleague's former client. The trial court asked her if she was declaring a conflict. She replied, "I have been instructed that I'm not authorized to do that," but put on the record her own "considered opinion" that "there was an ethical breach." Her understanding of her assignment from the county public defender, she said, was to "equip Mr. Lopez with the information so that he could, could make this motion on a theory of conflict."

Lopez immediately did so. "Somebody knows something about my case and they're being represented by the public defender's office and is willing to testify against me," he said. Noting that the prosecutor did not intend to call his attorney's colleague's former client as a witness, the trial court found no conflict of interest and denied his motion.

At his third *Marsden* hearing, on August 8, 2006, Lopez informed the trial court that the county public defender had refused to respond to his inquiry whether his office had represented any codefendant or any other witness and that he had found out that the public defender's office represented Hector Solis, a witness in custody on a pending murder case. Lopez's attorney replied that, once she brought the conflict to the attention of the deputy public defender representing Solis around the time of his preliminary hearing, the public defender's office conflicted off the Solis case.

Additionally, Lopez informed the trial court that the public defender's office had represented other witnesses against him. His attorney replied that the public defender's office "did represent some of them at some time" but that she was aware of no open cases other than the Solis case. Finding neither a "classic conflict with witnesses" nor "problems with the discovery or preparation of the defense" nor a "breakdown of the relationship" between attorney and client, the trial court denied Lopez's motion.

Now we turn to the colloquy in open court on May 16, 2007, immediately after the trial court adopted the county public defender's point of view that there was no conflict of interest. (*Ante*, pt. 8.) Lopez put on the record his refusal to waive, and his *Marsden* motion arising out of, the conflict of interest he perceived:

"DEFENDANT LOPEZ: Excuse me. Can you put on record that I did not waive it.

"THE COURT: Well—

"DEFENDANT LOPEZ: It's my choice too.

"THE COURT: Everything that's said here has been on the record.

"DEFENDANT LOPEZ: I'm just letting it be known so I can be heard that I said it too, you know—

"THE COURT: I understand.

"DEFENDANT LOPEZ: I want that conflict.

"THE COURT: I understand. Your position is clear.

"[LOPEZ'S ATTORNEY]: I think he wants something else, too, Your Honor.

"THE COURT: Don't ask me what he wants. [¶] So we'll be back here tomorrow morning at 9:30.

"[LOPEZ'S ATTORNEY]: We are not quite finished yet, Your Honor.

"THE DEFENDANT [LOPEZ]: As to a—a *Marsden* motion.

"THE COURT: That's a little bit untimely at this point.

"THE DEFENDANT [LOPEZ]: I'm asking for it.

"THE COURT: Well—

"[LOPEZ'S ATTORNEY]: It arises from his position with respect to the conflict.

"THE COURT: I understand what your position is.

"[LOPEZ'S ATTORNEY]: His position.

"THE COURT: That's what I mean. You believe—you do believe there's a conflict; your attorney does not believe there's a conflict. I'm finding there's not a conflict. If I'm wrong, the Appellate Court will correct me.

"DEFENDANT LOPEZ: You're denying my *Marsden* motion too?

"THE COURT: I'm finding the *Marsden* motion to be not timely at this point.

"DEFENDANT LOPEZ: Well, you're denying it then.

"THE COURT: I am saying what I'm saying. You're not telling me what I'm saying.

"DEFENDANT LOPEZ: No. You're saying—

"THE COURT: You—

"DEFENDANT LOPEZ: You're saying it's not timely—

"THE COURT: Mr. Barajas—

"DEFENDANT LOPEZ:—and you're denying it.

"THE COURT: Mr. Barajas—

"[BARAJAS'S ATTORNEY]: Excuse me, Your Honor. Mr. Barajas is not talking to you.

"THE COURT: Mr. Lopez. I'm sorry. I stand corrected. You need to follow the rules of court.

"DEFENDANT LOPEZ: I understand that, but you're—

"THE COURT: And one of the rules is, Mr. Lopez, don't argue with the judge. If you need to talk to your attorney before we proceed, I will give you a chance to do that. I have made my findings.

"THE DEFENDANT [LOPEZ]: I don't understand what you're trying to tell me. Is he denying it?"

After Lopez and his attorney's colleague held an off-the-record discussion, the following colloquy ensued:

"[LOPEZ'S ATTORNEY'S COLLEAGUE]: My client is confused as to whether or not your decision that the *Marsden* is untimely is a denial of his motion or a—

"THE COURT: You can have all the time you need to explain it to him, then, as soon as we're done here.

"[LOPEZ'S ATTORNEY'S COLLEAGUE]: Except I'm not sure that I understand it myself, Judge.

"THE COURT: You can speak up anytime you want.

"[LOPEZ'S ATTORNEY'S COLLEAGUE]: My client is asking for a *Marsden* motion.

"THE COURT: I understand. The *Marsden* motion at this time would not be timely."

The trial court's *Marsden* ruling came hard on the heels of four developments during the conflict of interest colloquy in open court. First, the

prosecutor granted Chavez use immunity, transactional immunity, and a release from custody in return for his testimony for the prosecution and for his waiver of any conflict of interest arising out of his prior representation by the public defender's office. Second, the county public defender denied the existence of a conflict of interest with Lopez arising out of his office's prior representation of Chavez. Third, Lopez declared, and refused to waive, a conflict of interest with the public defender's office. Fourth, the trial court found no conflict of interest. (*Ante*, pt. 8.)

■ In his attorney's words, Lopez's *Marsden* motion "arises from his position with respect to the conflict." From the record of the colloquy in open court immediately before his motion, a deteriorating attorney-client relationship is arguably inferable. "A criminal defendant is entitled to raise his or her dissatisfaction with counsel at any point in the trial when it becomes clear that the defendant's right to effective legal representation has been compromised by a deteriorating attorney-client relationship." (*Roldan, supra,* 35 Cal.4th at p. 681.) "It is well settled that a criminal defendant, at any stage of the trial, must be given the opportunity to state reasons for a request for new counsel." (*People v. Mack* (1995) 38 Cal.App.4th 1484, 1487 [45 Cal.Rptr.2d 614].) The question that arises on the record here is whether Lopez had that opportunity.

■ By "finding the *Marsden* motion to be not timely," perhaps the trial court meant that a *midtrial* motion is not timely. If so, that would be contrary to the law on the facts here. Although a trial court is entitled to deny as an impermissible disruption of the orderly processes of justice a midtrial *Marsden* motion belatedly challenging a pretrial ruling (*People v. Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr.`705, 502 P.2d 513]), Lopez's *Marsden* motion arose from the four developments in the conflict of interest issue that the trial court, half a dozen attorneys, and he had just memorialized. Alternatively, by "finding the *Marsden* motion to be not timely," perhaps the trial court meant that Lopez had already raised the conflict of interest issue at the three pretrial in camera *Marsden* hearings. Indeed, he had. Yet those hearings antedated the four conflict of interest developments that had just arisen.

Yet another possibility is that the trial court might have considered the colloquy in open court a *Marsden* hearing. The appointment of new counsel was the remedy Lopez sought not only by declaring a conflict of interest with the public defender's office but also by making a *Marsden* motion. Since "no single, inflexible procedure exists for conducting a *Marsden* inquiry," and since case law sometimes shows the prosecutor's presence during a *Marsden* hearing, the prosecutor's presence at the colloquy in open court was possibly of no consequence. (*People v. Madrid* (1985) 168 Cal.App.3d 14, 18 [213 Cal.Rptr. 813] (*Madrid*), citing, e.g., *People v. Avalos* (1984) 37 Cal.3d 216,

231 [207 Cal.Rptr. 549, 689 P.2d 121]; *Harris v. Superior Court* (1977) 19 Cal.3d 786, 791 [140 Cal.Rptr. 318, 567 P.2d 750].) An in camera *Marsden* hearing is "the better practice," but a *Marsden* hearing in open court is permissible where, as here, neither the defendant nor defense counsel asks for an in camera hearing and the defendant's complaints neither disclose information that conceivably could lighten the prosecutor's burden of proof nor involve evidence or strategy to which the prosecutor is not privy. (*Madrid, supra*, at p. 19; *People v. Stewart* (1985) 171 Cal.App.3d 388, 395 [217 Cal.Rptr. 306], disapproved on another ground in *People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192], as stated in *People v. Bolin* (1998) 18 Cal.4th 297, 346, fn. 16 [75 Cal.Rptr.2d 412, 956 P.2d 374].) So a *Marsden* motion requesting the *Marsden* hearing that had just occurred could, among other things, be considered not timely.

Lamentably, the record before us fails to clarify the trial court's enigmatic comment. So we agree with Lopez and the Attorney General that the denial of Lopez's *Marsden* motion as "not timely" was error. In the usual case, *Marsden* error requires a new trial since an inadequate record denies meaningful appellate review. (*Marsden, supra*, 2 Cal.3d at p. 126.) Yet no indication of ineffective assistance of counsel is in the record, the trial was free of error, and the only outstanding issue is the *Marsden* motion arising from the conflict of interest issue. In light of that set of unique circumstances, we will reverse the judgment and remand the matter with directions to the trial court to conduct a posttrial *Marsden* hearing and to exercise judicial discretion to order a new trial, reinstate the judgment, or proceed otherwise as authorized by law. (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1400–1402 [251 Cal.Rptr. 880]; *People v. Maese* (1985) 168 Cal.App.3d 803, 808–810 [214 Cal.Rptr. 365]; *People v. Minor* (1980) 104 Cal.App.3d 194, 199–200 [163 Cal.Rptr. 501] and cases cited; cf. *People v. Moore* (2006) 39 Cal.4th 168, 174 [45 Cal.Rptr.3d 784, 137 P.3d 959] [citing *Minor* with approval]; *People v. Hall* (1983) 35 Cal.3d 161, 170 [197 Cal.Rptr. 71, 672 P.2d 854] [same].)

## DISPOSITION

As to both judgments, the matter is remanded with directions to the trial court to strike the section 1203.11 restitution fines, to issue amended abstracts of judgment, and to send certified copies to the Department of Corrections and Rehabilitation. Barajas and Lopez have no right to be present at those proceedings. (See *People v. Price* (1991) 1 Cal.4th 324, 407–408 [3 Cal.Rptr.2d 106, 821 P.2d 610], superseded by statute on another ground as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161–1165 [68 Cal.Rptr.2d 440].) Otherwise, Barajas's judgment is affirmed.

Lopez's judgment is reversed and the case is remanded with directions to the trial court to conduct a posttrial *Marsden* hearing and exercise judicial discretion to order a new trial, to reinstate the judgment, or to proceed otherwise as authorized by law. (§ 1260.) Lopez has the right to be present at those proceedings.

Wiseman, Acting P. J., and Dawson, J., concurred.

Appellants' petitions for review by the Supreme Court were denied March 11, 2009, S169161.