Filed 6/2/15  P. v. Lewis CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B255077 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA406579) |
| v. | |
| KEITH DWAYNE LEWIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Reversed and Remanded.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Keith Dwayne Lewis of the attempted murders of Daniel and Miguel Meza, finding true the allegation that the attempted murders

were deliberate and premeditated (Pen. Code, §§ 664/187, subd. (a)), and also convicted him of assault with a firearm on Alejandro Arroyo (§ 245, subd. (a)(2)).[1] As to all counts, the jury found that the crimes were committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)), and as to the attempted murders, the jury found true the allegation that a principal intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (c), (d), and (e)(1)). In a bifurcated proceeding, the court found that defendant had previously been convicted of a strike offense (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a serious felony (§ 667, subd. (a)(1)), and that he had served four prior prison terms (§ 667.5, subd. (b)). The court sentenced defendant to consecutive terms of life in prison on the attempted murder convictions, plus 25 years to life for the firearm enhancements, and a consecutive term of 18 years to life on the assault with a firearm conviction and gang enhancement.

Defendant appeals from the judgment of conviction, contending: (1) the evidence is insufficient to support his convictions as an aider and abettor, and (2) the trial court erred in denying his request for a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118) as untimely.[2] We find that sufficient evidence supports defendant's convictions, but conclude that the court erred in failing to conduct a *Marsden* hearing. We therefore reverse the judgment and remand the case for the limited purpose of conducting a *Marsden* hearing and, depending on the court's ruling, ordering a new trial or reinstating the judgment.

---

[1]     Undesignated section references are to the Penal Code.

[2]     In his opening brief, defendant also challenges the firearm enhancement in the attempted murder count relating to Miguel Meza. In his reply brief, he withdraws the contention and therefore we do not discuss it.

# BACKGROUND

Defendant belonged to the East Side Trece gang. Attempted murder victim Daniel Meza belonged to the rival Loco Park gang. Around 8:30 p.m. on January 5, 2013, Daniel and his younger brother Miguel (who was not a gang member) entered a family market near 25th and Hooper in Los Angeles, which was in Loco Park territory. After buying beer, they were leaving when Daniel saw appellant and two other men whom he recognized as East Side Trece gang members outside: defendant, Robert Grandos (who Daniel knew as Little Rob) and an unidentified third man. When they saw Daniel, defendant and Grandos called out confrontationally "East Side Trece," and said (among other things) "Fuck lollypops," an insult "dissing" Daniel's gang, Loco Park. Daniel was standing next to his brother, perhaps a foot away from defendant. He then saw defendant wave with his hand as if to demand that Daniel come outside, and heard defendant say, "Get him." Daniel started to go outside, and at the doorway heard shooting. He did not see anyone with a gun. He turned and ran into the store. He was shot seven times (three in his chest, two in his back, and two in his arm), but survived. Daniel's brother, Miguel, was shot once in the shoulder. A third victim, Alejandro Arroyo, who happened to be in the store, was shot in the wrist.

The events were captured by video security cameras at the market and an edited video compilation was played for the jury during testimony. The video (Exh. 3A) showed the following. Defendant and two companions walked past the front window of the market. Defendant (identified as the heavy set one of the group) looked in through the window as they passed, and did a double take, craning his neck as if to look again more closely through the window. All three men stopped, and then walked back to the front door, stopped, and separated, defendant standing in the doorway facing the market, Grandos a few feet to

3

defendant's right on the sidewalk, and the unidentified man on the sidewalk a few feet to defendant's left. According to Daniel, who viewed the video while testifying, it was at this point that defendant hurled insults against the Loco Park gang. Shortly thereafter, the video showed defendant stepping away from the doorway. Miguel Meza walked out the door onto the sidewalk. Daniel appeared on the sidewalk at the doorway. At that point, defendant's unidentified companion approached from behind defendant and started shooting in the direction of the store. Defendant, who was only a few feet away from the shooter, appeared to flinch slightly and step aside toward the street. Miguel and Daniel fled inside the store. The shooter approached nearer to the store and fired several more times. Then he, defendant, and Grandos ran off.

Defendant was wearing an ankle bracelet monitored by the Department of Corrections and Rehabilitation. On the date of the shooting, GPS tracking data showed that at 8:38 p.m. he was at 25th Street and Hooper (the approximate time and site of the shooting), and that approximately five minutes later he was at 1225 and 1227 West 27th Street, the location of the home of Robert Grandos.

The prosecution gang expert, Los Angeles Police Officer David Dixon, who was familiar with the East Side Trece gang, was asked a hypothetical question based on the evidence of the shooting. He testified that such a shooting would have been committed to benefit the East Side Trece gang as a means of gaining respect and instilling fear. He further testified that gang members entering a rival gang's territory would typically be armed in anticipation of violence. Similarly, Daniel testified that a gang member would enter a rival gang's territory "I guess to go put in work . . . to go shoot somebody," and "no one would ever walk into another neighborhood without no gun . . . because you will get shot."

4

# DISCUSSION

## I.    *Sufficiency of the Evidence*

Defendant contends that the evidence is insufficient to prove that he aided and abetted the attempted, deliberate, premeditated murders of Daniel and Miguel Meza, and the assault with a firearm on Alejandro Arroyo.  Although he acknowledges the deferential standard of review, the crux of his contention is a reweighing and parsing of the evidence into unconnected pieces, an aversion to drawing reasonable inferences, and a cataloguing of evidence that in his view might have been sufficient but was absent.  Applying the proper standard of review, we conclude that the evidence is sufficient to support defendant's convictions.  Of course, we view the entire record in the light most favorable to the judgment, and presume in support all reasonable inferences that can be drawn from the evidence.  (*People v. Albillar* (2010) 51 Cal.4th 47, 50-60.)

Defendant was convicted as an aider and abettor of the attempted murders of Daniel and Miguel, and the jury found true as to each count that the attempted murders were deliberate and premeditated.  "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]  To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.'  [Citations.]  In addition, except under the natural-and-probable-consequences doctrine [citations], which is not implicated on the facts presented here, the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question.  [Citations.]  When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific

5

intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 623-624 (*Lee*).)

In addition, where, as in the instant case, it is alleged that the attempted murder was deliberate and premeditated under section 664/187, subdivision (a), it is necessary only that the actual perpetrator deliberated and premeditated. So long as the aider and abettor shared the intent to kill, he is liable for the enhanced punishment for deliberate and premeditated attempted murder, even though he himself did not deliberate and premeditate. (*Lee, supra,* 31 Cal.3d at p. 624.)

Here, the evidence showed that defendant and his two companions, Grandos and the unidentified shooter, were East Side Trece gang members. They entered the territory of a rival gang, Loco Park, and passed the market that was the scene of the shooting. As Officer Dixon and Daniel testified, gang members entering a rival's territory typically arm themselves. Indeed, Daniel was more specific: a gang member enters a rival gang's territory "I guess to go put in work . . . to go shoot somebody," and "no one would ever walk into another neighborhood without no gun . . . because you will get shot."

The evidence of the shooting – Daniel's testimony and the surveillance video – strongly support the inference that defendant entered Loco Park territory with the expectation of "put[ting] in work," knowing that one of his companions

6

was armed. The video showed that as defendant and his two companions walked past the front window of the market, defendant looked in and did a double take, inferably recognizing Daniel as a member of Loco Park into whose territory they had entered, and suspecting that Daniel's companion, Miguel, was also a rival gang member. Defendant and his two companions walked back to the front door, stopped, and separated. According to Daniel, defendant, who was standing in the doorway facing the market, and Grandos issued gang threats, calling out the name of their gang ("East Side Trece") and insulting Daniel's gang ("Fuck lollypops.") Defendant waved his hand calling on Daniel to come outside, and then said "Get him." Almost immediately thereafter, Daniel started to go outside, and at the doorway heard shooting.

As the video tape showed, Miguel walked out the door onto the sidewalk. Daniel appeared at the doorway just onto the sidewalk. Defendant's unidentified companion approached from behind defendant and started shooting in the direction of the store. Defendant, who was only a few feet away from the shooter, appeared to flinch slightly at the sound of the shots and stepped aside toward the street, getting out of the way of the shooter. Miguel and Daniel fled inside the store. The shooter approached nearer to the store and fired several more times. Daniel was shot seven times and Miguel was shot once. Then the shooter, defendant, and Grandos ran off. As Officer Dixon testified based on a hypothetical question mirroring the evidence of the shooting, such a shooting would be committed to benefit the East Side Trece gang, enhancing the reputation of the gang and instilling fear. Within minutes after the shooting, GPS tracking of defendant's ankle bracelet showed that defendant went to Grandos' home.

From this evidence, it could reasonably be inferred that the shooter intended to kill Daniel and Miguel, and that he deliberated and premeditated that intent. In

7

rival gang territory, he was "put[ting] in work," firing multiple shots at people he perceived to be associated with a rival gang.

It could also be inferred that defendant shared the shooter's intent to kill. That is, knowing that his companion was armed in rival gang territory, he observed Daniel (a member of a rival gang) and Miguel together in the market. He hurled gang insults, motioned for Daniel to come outside, and then called on his companion to "get him," meaning to shoot Daniel and (it may be inferred) Daniel's companion, Miguel. On this basis, the evidence was sufficient to support the defendant's conviction of the attempted murders, with the finding that the attempted murders were deliberate and premeditated.

Defendant's arguments to the contrary simply ignore the standard of review on appeal and fail to admit the reasonable inferences that can be drawn from the evidence. Thus, he asserts "it is . . . speculative that [he] himself knew of the shooter, who came from behind him." He downplays the testimony of Officer Dixon and Daniel that gang members typically arm themselves before going into a rival gang's territory, and argues that there is "no evidence of specific pre-offense planning, or specific references to using a gun." He notes the absence of evidence of an ongoing gang war between East Side Trece and Loco Park, and speculates that defendant's reaction to the shooting shown on the video tape suggests surprise not complicity. All such arguments are appropriate for, and were made at, trial. But they do not undercut the sufficiency of the evidence to prove defendant's guilt of attempted murder on appeal.

For much the same reason, defendant was liable as an aider and abettor for the shooter's assault with a firearm on Alejandro Arroyo. Using a firearm, the shooter willfully committed an act that probably would result in the application of physical force on Arroyo (§ 245, subd. (a)(2)), a bystander in the store into which

8

the shooter fired. Indeed, Arroyo was wounded in the wrist. Defendant aided and abetted that crime by encouraging the shooter to fire. Thus, the evidence was sufficient to sustain his conviction for assault with a firearm.

## II. *Marsden Motion*

Defendant contends that the trial court erred in not holding a *Marsden* hearing, that is, a hearing outside the presence of the prosecution and jury that would have allowed the defendant an opportunity to convey his dissatisfaction with his court-appointed lawyer and the reasons he should be granted a new attorney. (See *People v. Lopez* (2008) 168 Cal.App.4th 801, 814-815 (*Lopez*).) We agree.

Outside the presence of the jury, after the first two witnesses had testified, the court stated: "I got a note [from the bailiff] this morning as the jury was in the box and were ready to start the case [stating] 'Defendant says he wants to make a *Marsden* motion right now.' I did not recess the case for that purpose, and I just want to explain why. I felt that it was untimely. We are in the middle of trial. I don't think that that's an appropriate time to make a *Marsden* motion, so that's why the court did not interrupt proceedings." Defense counsel stated that "[t]his is the first I have heard about it, Judge. I would have brought it to the court's attention." The issue did not arise again.

In deeming the request for a *Marsden* hearing untimely because it was in the middle of trial, the court erred. "A criminal defendant is entitled to raise his or her dissatisfaction with counsel at any point in the trial when it becomes clear that the defendant's right to effective legal representation has been compromised by a deteriorating attorney-client relationship." (*People v. Roldan* (2005) 35 Cal.4th 646, 681; see *Lopez, supra,* 168 Cal.App.4th at p. 814 [trial court's finding *Marsden* motion to be untimely because made midtrial was "contrary to the law"];

9

*People v. Mack* (1995) 38 Cal.App.4th 1484, 1487 ["It is well settled that a criminal defendant, at any stage of the trial, must be given the opportunity to state reasons for a request for new counsel"].) Respondent's contention that without holding a hearing the trial court acted within its discretion in deeming the *Marsden* motion untimely is without support in the case law.

We conclude that the proper remedy is a limited remand for the trial court to conduct a *Marsden* hearing. During trial, defendant never voiced dissatisfaction with his attorney and never again asked for a *Marsden* hearing. Further, the record gives no indication of ineffective assistance of counsel. Under these circumstances, it is appropriate to reverse the judgment and remand the case for the trial court to conduct a *Marsden* hearing. (*People v. Hill* (2013) 219 Cal.App.4th 646, 653-654; *Lopez, supra,* 168 Cal.App.4th at p. 815; *People v. Olivenica* (1988) 204 Cal.App.3d 1391, 1400-1401.)

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court to conduct a *Marsden* hearing in which defendant shall be permitted to state the reasons for his dissatisfaction with his trial attorney and his desire to have another attorney appointed. The trial court shall have discretion to consider defendant's complaint in light of the manner in which his counsel actually performed at trial. If the court determines that good cause for the appointment of new counsel has not been shown, it shall reinstate the verdicts and judgment. If the court determines that good cause for appointment of new counsel has been shown, the court shall appoint new counsel and set the case for retrial.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P.J.



We concur:




MANELLA, J.




COLLINS, J.

11