Filed 7/30/14  P. v. Zamora CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057915 |
| v. | (Super.Ct.No. FBA009351) |
| PAUL ZAMORA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Rodney A. Cortez, Judge.  Reversed with directions.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Collette C. Cavalier, and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Paul Zamora pled guilty to second degree murder (count 1 – Pen. Code, § 187, subd. (a)).[1] Pursuant to the plea agreement, the court sentenced defendant to an indeterminate term of imprisonment of 15 years to life with credit for 3,030 days. On appeal, defendant contends the court erred in failing to hold a *Marsden*[2] hearing when defendant sought to withdraw his plea based on ineffective assistance of counsel. We reverse the judgment and remand the matter to the court with directions.

FACTUAL AND PROCEDURAL BACKGROUND[3]

On June 26, 1987, Officer Pedro Ortiz, a detective assigned to the homicide division of the San Bernardino County Sheriff's Department, responded to a report of a body found on the side of the Interstate 15 freeway. He found "a female [body] that was badly decomposed lying on [its] back. [Its] [l]egs were spread. [Its] sweatshirt was exposing [] most of [the] stomach area as well as one of [the] breasts, and [it] had several stab wounds to the breast area." The shorts were pulled down from the waist halfway down the buttocks in the back, consistent with the body having been dragged.

---

[1] All further statutory references are to the Penal Code.

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). A so-called *Marsden* hearing is typically conducted outside the presence of the public, the jury, and the prosecution and allows the defendant an opportunity to convey to the court reasons he should be appointed new counsel. (*People v. Lopez* (2008) 168 Cal.App.4th 801, 814-815.)

[3] The parties stipulated the preliminary hearing transcript would provide the factual basis for the plea; thus, we take the facts from the preliminary hearing which took place on August 2, 2007.

The body was later identified as that of the victim, who had been reported missing on June 25, 1987, around 8:00 a.m. by her boyfriend Michael Miller. The body was dressed in the same clothing in which the victim had last been seen. Ortiz interviewed Miller.

Miller reported he and the victim had been working in Northern California and were on their way back to Grand Junction, Colorado with a friend when they stopped for gas on June 23, 1987, around midnight. They had been drinking; the victim was drunk. Miller asked the victim for money for gas; she refused. They got into an argument; Miller reached into her purse and took her money; he then entered the store. He later saw the victim hitchhiking by the guardrail.

When he came out of the store, she was gone. Miller and their friend drove around for about a half an hour looking for her, but could not find her. They drove back to Grand Junction, Colorado and reported her missing. Criminalist Dan Gregonis arrived at the scene on June 26, 1987, to collect evidence. He took DNA samples from the victim's underwear, shorts, and vagina. The parties stipulated the DNA taken from a buccal swab of defendant matched the DNA taken from semen on the crotch of the victim's underwear, shorts, and vaginal swabs.

San Bernardino Deputy Sheriff Thomas Shenton arrested defendant and interviewed him after he waived his *Miranda*[4] rights. Defendant told Shenton he was a truck driver in June 1987 with a regular route from Santa Fe Springs, California to Las

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

3

Vegas, Nevada. Defendant admitted picking up hitchhikers, but denied knowing the victim.

Shenton interviewed defendant's ex-wife, Victoria Olivares. Olivares confirmed defendant's employment as a truck driver with a regular route from Santa Fe Springs, California to Las Vegas, Nevada in June 1987, which he travelled three times a week. She reported that sometime in June 1987, defendant returned with scratches on his hand and chest and a finger in a splint.

Deputy Public Defender Maggie Eisenburg made her first appearance on behalf of defendant on July 30, 2010. On August 23, 2012, Eisenburg filed six separate in limine motions seeking, respectively, to permit impeachment of Gregonis with allegations of alleged improprieties in his evidence collection and processing in other cases, exclusion of Olivares's statements to police, exclusion of a knife found in defendant's residence in 2006, permission to introduce evidence of third party culpability implicating Miller as the actual killer, exclusion of evidence of defendant's 1993 kidnapping conviction, and exclusion of evidence of a green bottle found at the crime scene.[5]

At the hearing on September 20, 2012, regarding the motions in limine, the court granted the defense motion to impeach Gregonis with one of his prior cases, but denied the motion with respect to impeachment with other cases. The court denied the remaining defense motions.

---

[5] Olivares informed police defendant drank from green beer bottles.

4

Eisenburg observed, "it really cuts [defendant's] defense off at the knees to not be able to point [at] the boyfriend of the victim who was her travel partner." "I understand the Court's ruling. I just feel that it cuts off any affirmative defense that we have because we're not allowed to attack Gregonis very much on the DNA, which is the entire prosecution's case, and I can't even point the finger at the boyfriend . . . ."

The People then conveyed to the court they had offered defendant a plea deal with a sentence of 15 years to life with credit which would place him close to a parole date.[6] The court asked if the offer had been conveyed to defendant; defendant replied it had. The court told defendant to speak with Eisenburg regarding the offer: "I set aside the whole day. So if you guys want to talk some more, why don't you go ahead and talk some more. All right. And then let me know and I'll come out and confirm everything unless you're able to resolve the case." A recess was taken from 2:00 p.m. to 3:44 p.m.

When the parties returned, the court announced, "All right. [Defendant], I'm showing you a [three]-page document entitled Declaration of Defendant Regarding Change of Plea with your name on the top. Do you recognize it?" Defendant responded, "Yes." The court asked defendant if he had signed and initialed "each paragraph after reading, understanding, and discussing each paragraph with your attorney?" Defendant responded he had. The court queried defendant, "[b]efore signing and initialing the form, did you carefully go over both the printed and handwritten portions of the form with your

---

**6** Defendant's eventual credit award of 3,030 days (more than eight years), would require that he serve almost an additional seven years, without considering any credit he might earn in prison, before he would be eligible for parole.

5

attorney?" Defendant answered, "Yes." The court inquired whether defendant understood everything on the form? Defendant said he did.

The court then covered defendant's constitutional rights and his waiver of them. It asked defendant if "you had enough time to discuss your case with your attorney, including . . . future consequences as a result of entering this plea?" Defendant responded, "Yes." The court asked defendant if he had any questions of the court. Defendant said he did not.

The court asked Eisenburg whether she "had adequate time to discuss all issues with [her] client?" She responded she had. The court asked if Eisenburg went "over the declaration and plea form with [defendant]?" She said she had. The court inquired whether Eisenburg was "satisfied [defendant] understands everything on the form." She said she was. Eisenburg joined in defendant's waivers. The court then concluded, "After directly examining the defendant, the court finds he has read and understood the defendant's declaration and plea form."

Defendant then orally pled guilty to second degree murder. Term 20 of defendant's plea form, reading "I waive and give up any right to appeal any motion I may have brought or could bring and from the conviction and judgment in my case since I am getting the benefit of my plea bargain[,]" is crossed out; defendant did not initial it.

On October 10, 2012, Eisenburg "asked to have [the hearing] calendared . . . based on a miscommunication regarding one aspect of the plea [regarding] . . . appellate rights, . . . [¶] . . . I understood . . . that [defendant] had the right to appeal the in limine rulings after [the] plea. . . . And so I indicated that to [defendant] throughout that,

6

somewhere along the line in that conversation that we had about the plea. [¶] And so . . . I looked into it myself – I found out the next day that . . . in limine rulings are not appealable [after the] plea. I told [defendant] that and that is what the motion to withdraw the plea is based on. [¶] And so at this point since he hasn't been sentenced, and I told him, I said, I will indicate to the Court that I told you the wrong thing. I told him the very next day that it was wrong and that we had to try to kind of figure [it] out . . . . I'm not sure how the Court wants to proceed, if you want to do the typical appoint someone and do a hearing. . . ." The court responded "That's the way we're going to proceed."

The court asked defendant if he wanted to withdraw his plea; defendant responded he did. The court appointed Richard Crouter, who was present at the hearing, as conflict counsel for defendant for the purpose of filing a motion to withdraw the plea. The court asked Crouter how much time he would need to prepare the motion. Crouter responded, "Well, from what I've heard, the basis for the motion, I think it's going to take some fairly extensive research, I would say a month." The court scheduled the hearing for November 16, 2012, and inquired of Eisenburg, "I would imagine that you will be testifying as a witness in regards to what you advised your client." She responded, "Is it possible to do it earlier that week [be]cause I will be leaving town that day?" The court replied "We can do it on the 15th." Esienburg said "That's fine. That would be great if that's possible." The court asked conflict counsel if that date was satisfactory. Crouter responded it was. The court set the matter for November 15, 2012.

7

On December 12, 2012, Crouter was replaced by John Burdick as conflict counsel for defendant. On January 3, 2013, Burdick filed a motion to withdraw the plea. After presenting the law regarding the withdrawal of pleas, the motion reads, "In the present case the defendant[] requests to withdraw his plea having had second thoughts after entering it. . . . The defendant claims he did not understand the nature and consequences of his plea as entered. However, a review of [the] 'Change of Plea' [form] reveals that the plea is at least facially valid. We therefore invite the Court to review the proceeding and record to determine whether the defendant has any basis to withdraw his plea[.]" Burdick then cited to *People v. Wende* (1979) 25 Cal.3d 436. (*Id*. at pp. 441-442 [Court of Appeal to conduct independent review of record on appeal when appellate counsel files a brief raising no appellate issues].)

Burdick attached his own declaration to the motion reading "I had an opportunity to discuss the case with the defendant who informed me that he had not been properly advised of the consequences of the plea. [¶] . . . [¶] . . . I am informed that the defendant contends he did not completely comprehend the nature of his plea. I reviewed the case records and do not find a basis to withdraw the plea however and therefore invite the Court to examine the record."[7]

On January 4, 2013, the court held the hearing on the motion to withdraw the plea. Eisenburg was present at the hearing. Defendant testified he wanted to withdraw his plea

[7] No mention of Eisenburg's purported misadvisement regarding the appealability of the rulings on the motions in limine is made in the motion to withdraw the plea. Likewise, neither is there a declaration from Eisenburg attached to the motion nor any indication she would testify at the hearing on the motion.

"because at the time when I signed the plea agreement – the boxes to the right of the papers, [Eisenburg], . . . told me to just – to initial each one, and to read all of this. I says, I can't read without my reading glasses. I can't even see it. She said go ahead and – just go ahead and initial them all. So, I did. . . . [¶] . . . [¶] I – I can't – if I plead guilty, I can't appeal my case." Defendant testified his attorney did not read or go over the written portions of his plea form. He did not remember the judge asking him if he had read and gone over the plea form with Eisenburg or saying that he had "[b]ecause everything was being said so fast, I couldn't keep up with [] what the Judge was saying." Defendant testified he believed he had told the court he understood the plea because Eisenburg told him to "[g]o ahead and sign it. Just, you know, agree."

On cross-examination, defendant testified he had been convicted of "[p]robably about 10" felonies, including thefts, kidnapping, armed robberies, burglaries, and assaults. In each, he had pled guilty; this was not the first time he had signed a plea agreement. The main reason defendant was attempting to withdraw his plea was because he was having second thoughts because even if convicted at trial, he could only be sentenced to imprisonment of up to 25 years to life, while pursuant to his plea he would already be sentenced to imprisonment of 15 years to life: "I'm getting a life sentence anyway. . . . And the fact that I didn't do it – the murder. That's why I – I decided to go to trial."

The court indicated it had reviewed the motion and the transcript of the plea. "I set aside that entire day so we could handle motions in limine, as well. But then later in the day [defendant] decided to enter a guilty plea to the second-degree murder charge.

9

[¶] At no time was everything going at such a fast pace, because the day was devoted to [defendant's] case. I recall even taking the plea. And before taking the plea, Counsel wanted to have more discussions. [Defendant] wanted to have more discussions after the motion in limine rulings. And we took plenty of time. And as I went through the plea, I didn't take it at a fast pace. I took it slowly and clearly, and waited for his responses to each of those questions." The court found defendant's motion to withdraw the plea was based on "buyer's remorse" and denied the motion. The court relieved conflict counsel and reappointed Eisenburg.

Eisenburg represented defendant at sentencing. On January 16, 2013, Eisenburg filed a notice of appeal on defendant's behalf requesting a certificate of probable cause based on the court's denial of the motion to withdraw the plea. The court granted the certificate of probable cause.

## DISCUSSION

Defendant maintains the court erred in failing to conduct a *Marsden* hearing upon Eisenburg's initial contention there were grounds to withdraw defendant's guilty plea based upon Eisenburg's purported rendition of ineffective assistance of counsel in advising defendant of the appellate consequences of his plea; in particular, defendant's inability to appeal the court's denial of the motions in limine. The People argue that since defendant never clearly indicated he wanted substitute counsel, the court was under no obligation to hold a *Marsden* hearing. We agree with defendant.

"[A] trial court must conduct [] a *Marsden* hearing only when there is at least *some clear indication* by the defendant, either personally *or through counsel, that*

10

*defendant wants a substitute attorney*. [I]f a defendant requests substitute counsel and makes a showing during a *Marsden* hearing that the right to counsel has been substantially impaired, substitute counsel must be appointed as attorney of record *for all purposes*." (*People v. Sanchez* (2011) 53 Cal.4th 80, 84 [italics added] (*Sanchez*); see *People v. Dickey* (2005) 35 Cal.4th 884, 920 (*Dickey*).) "[A]t any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated . . . to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney. [Citation.]" (*Sanchez,* at p. 90.) "'[T]he trial court's duty to conduct a *Marsden* hearing [is] triggered by defense counsel's request for appointment of substitute counsel to investigate the filing of a motion to withdraw [the] plea on [the defendant's] behalf.'" (*Sanchez* at p. 90, fn. 3.) Thus, a defense counsel's motion for substitute counsel to investigate the filing of a motion to withdraw the plea based upon the incompetency of counsel is a clear indication by a defendant that he wants substitute counsel which automatically triggers the trial court's duty to hold a *Marsden* hearing.

The *Sanchez* court "specifically disapprove[d] of the procedure of appointing substitute or 'conflict' counsel solely to evaluate a defendant's complaint that his attorney acted incompetently with respect to advice regarding the entry of a guilty or no contest plea." (*Sanchez, supra,* 53 Cal.4th at p. 84.) "'Defense counsel, like the trial courts, should abandon their reliance on counsel specially appointed to do the trial court's job of evaluating the defendant's assertions of incompetence of counsel and deciding the defendant's . . . plea withdrawal motion. [Citation]'" (*Id.* at p. 89.) "'The proper procedure does not include the appointment of "conflict" or "substitute" counsel to

11

investigate or evaluate the defendant's proposed . . . plea withdrawal motion.'" (*Id.* at p. 89.)

Here, defendant, through counsel, moved to withdraw his plea specifically on the basis of ineffective assistance of counsel. Defense counsel informed the court she had expressly informed defendant that he could appeal the pretrial motions in limine if he pled guilty. Indeed, the term of defendant's plea agreement expressly informing him he could not appeal the denial of pretrial motions is crossed out; defendant did not initial the provision. Eisenburg informed the court that only after defendant had entered his guilty plea did she discover defendant could not appeal the denial of those motions. She said that a contemplated motion to withdraw the plea would be based upon her misadvisement of defendant on that basis.

Eisenburg asked if the court wanted to appoint someone else: "So seeing that it is presentencing and because it's not [defendant] bringing it up after he's been fully sentenced, I'm not sure how the Court wants to proceed, if you want to do the typical appoint someone and do a hearing . . . ." Thus, Eisenburg implicitly recognized the possibility new counsel should be appointed not only for purposes of the motion to withdraw the plea, but for sentencing as well. Defense counsel's suggestion that substitute counsel be appointed to investigate the filing of a motion to withdraw the plea based upon her misadvisement is a clear indication by defendant that he wanted substitute counsel which triggered the trial court's duty to hold a *Marsden* hearing.

Instead of "evaluating [] defendant's assertions of incompetence of counsel and deciding [] defendant's . . . plea withdrawal motion[]", (*Sanchez, supra,* 53 Cal.4th at p.

12

89) the court conducted the "specifically disapprove[d] . . . procedure of appointing substitute or 'conflict' counsel solely to evaluate [] defendant's complaint that his attorney acted incompetently with respect to advice regarding the entry of [the] guilty . . . plea. (*Id*. at p. 84.) Conflict counsel filed a motion to withdraw the plea in which he effectively argued there was no basis to withdraw the plea. Conflict counsel failed to raise the specific basis initially raised for defendant's desire to withdraw the plea, Eisenburg's ostensible misrepresentation of the appellate consequences of the plea. Since defendant had brought an issue of potential ineffective assistance of counsel to the court's attention while moving for a withdrawal of his guilty plea and appointment of new counsel, the court should have conducted a *Marsden* hearing to evaluate whether Eisenburg had acted incompetently and, if so, appointed new counsel to represent defendant during the remainder of the criminal proceedings.

The People cite *People v. Dickey* (2005) 35 Cal.4th 884 (*Dickey*), for the proposition that, here, defendant did not make the requisite """"clear indication . . . that he want[ed] a substitute attorney."'" [Citations.]' [Citation.]" (*Id*. at p. 920.) In *Dickey*, after defendant was convicted of murder and other charges, but prior to the penalty phase of trial, defense counsel informed the court the defendant wished to move for a new trial based partially on a claim of ineffective assistance of counsel. Defense counsel suggested the appointment of separate counsel to represent the defendant in that effort. (*Id*. at pp. 918-920.) The trial court appointed the defendant separate counsel to assist him in his preparation of a new trial motion filed after the penalty phase which was based on purported ineffective assistance of counsel and the court's ostensible error in

13

neglecting to hold a *Marsden* hearing at the time the subject was initially broached. The trial court denied the motion. (*Id.* at pp. 920, 922.)

The California Supreme Court held the trial court did not commit *Marsden* error. (*Dickey, supra,* 35 Cal.4th at p. 920.) The Court reasoned, "Defendant did *not* clearly indicate he wanted substitute counsel appointed for the penalty phase. To the extent he made his wishes known, he wanted to use counsel's assertedly incompetent performance in the guilt phase as one of the bases of a motion for new trial, and he wanted to have separate counsel appointed to represent him in the preparation of such a motion. As his expressed wishes were honored, he has no grounds for complaint now." (*Id.* at pp. 920-921.) In addition, the court concluded any "*Marsden* motion would have been baseless[]" because "[w]e do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements." (*Id.* at pp. 921, 922.) This was because the new trial motion was based on defendant's contention certain witnesses who were not called to testify should have been and that during the defendant's testimony he should have been asked questions he was not. (*Id.* at pp. 919-922.)

It is difficult to reconcile the holdings in *Sanchez* and *Dickey*. Nonetheless, the unanimous *Sanchez* court distinguished *Dickey*, noting the defendant therein "expressed the desire to have a substitute counsel represent him *at a future proceeding*, namely, an anticipated motion for new trial *that would not take place until the completion of the penalty phase*. The defendant [] *voiced no objection to having his current attorney represent him at the penalty phase* and, unlike the present case, did not seek to discharge his current attorney." (*Sanchez, supra*, 53 Cal.4th at p. 91, italics added.) In its own

14

case, "by contrast, [the] defendant, *through counsel*, requested that a 'conflict' or substitute attorney be appointed *immediately*, and the obvious implicit ground for that request was the incompetency of defendant's currently appointed counsel." (*Id*. at p. 91, italics added.)

Here, defendant, through Eisenburg, requested conflict counsel be appointed *immediately* based on the Eisenburg's incompetency in advising him of the appellate consequences of the plea. Moreover, Eisenburg's purported act of ineffective assistance of counsel was not tactical, but substantive: Eisenburg conceded she misadvised defendant that he could appeal the court's denial of the motions in limine. This very well could have affected defendant's decision to enter the plea. Indeed, defendant testified at the hearing on the motion to withdraw the plea that at least one of the bases upon which he wished to withdraw the plea was the fact that "I can't appeal my case." Thus, it cannot be said here that a *Marsden* motion would be baseless.

Furthermore, in *Dickey*, the initial basis for appointment of counsel was for a new trial motion which was only partially based on incompetence of counsel. In the instant case, the request for new counsel was for the filing of a motion to withdraw the plea based, at that point, *entirely* on ineffective assistance of counsel. Finally, we note the *Sanchez* Court made clear that "'the trial court's duty to conduct a *Marsden* hearing [is] triggered by defense counsel's request for appointment of substitute counsel to investigate the filing of a motion to withdraw [the] plea on [the defendant's] behalf.'" (*Sanchez, supra,* 53 Cal.4th at p. 90, fn. 3.) Here, Eisenburg requested appointment of

15

counsel to investigate the filing of a motion to withdraw the plea on defendant's behalf which triggered the court's duty to conduct a *Marsden* hearing.

As indicated above, the California Supreme Court in *Sanchez* specifically proscribed the procedure adopted by the court in this case; namely, the appointment of a substitute or "conflict" attorney solely to evaluate whether a criminal defendant has a legal ground upon which to move to withdraw the plea on the basis of current counsel's incompetence. (*Sanchez, supra,* 53 Cal.4th at p. 84.) The court erred in following the disapproved procedure rather than immediately holding a *Marsden* hearing for the potential appointment of substitute counsel for the remainder of the criminal proceedings.

The question remains whether the court's error in neglecting to hold a *Marsden* hearing and follow the procedure prescribed in *Sanchez* could be deemed harmless. Early courts (never expressly overruled) held the denial of a *Marsden* hearing upon a defendant's motion for substitute counsel was per se prejudicial and required automatic reversal of *the judgment* because the failure to permit a defendant to provide his reasons for requesting new counsel precluded meaningful appellate review. (*Marsden, supra,* 2 Cal.3d at p. 126; accord *People v. Hidalgo* (1978) 22 Cal.3d 826, 827; *People v. Lewis* (1978) 20 Cal.3d 496, 498; *People v. Munoz* (1974) 41 Cal.App.3d 62, 67; *People v. Groce* (1971) 18 Cal.App.3d 292, 296-297; *People v. Hill* (1983) 148 Cal.App.3d 744, 755; *People v. Winbush* (1988) 205 Cal.App.3d 987, 991.) Subsequent courts (also not overruled) found the refusal to provide a *Marsden* hearing per se prejudicial and reversible, but permitted remand for a *Marsden* hearing which, if denied, permitted reinstatement of the original judgment. (*People v. Minor* (1980) 104 Cal.App.3d 194,

16

199; *People v. Hall* (1983) 35 Cal.3d 161, 170; *People v. Maese* (1985) 168 Cal.App.3d 803, 808-810; *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1401-1402.)

Nevertheless, the majority of courts since have held the denial of a defendant's right to a *Marsden* hearing must be reversed unless the appellate court finds the error was harmless beyond a reasonable doubt. (*People v. Hill* (2013) 219 Cal.App.4th 646, 653.) Courts finding the erroneous failure to provide a defendant a *Marsden* hearing harmless beyond a reasonable doubt, generally fall into one of two categories. The first group consists of courts which have found the failure of a trial court to conduct a *Marsden* hearing immediately upon a defendant's expression of a desire for new counsel harmless where the court had either previously or subsequently afforded the defendant a *Marsden* hearing at which the defendant raised the same issues as in the other motion(s). (*People v. Taylor* (2010) 48 Cal.4th 574, 601 [Prior *Marsden* hearing rendered failure to provide subsequent hearing harmless]; *People v. Govea* (2009) 175 Cal.App.4th 57, 62 [same]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1105-1113 [same]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 788 [Any error of court in failing to hold *Marsden* hearing at the defendant's first complaint regarding defense counsel was rendered harmless by court's later holding of *Marsden* hearing.]; *People v. Lloyd* (1992) 4 Cal.App.4th 724, 731-732 [same].)[8]

---

[8] It is notable that the court in *Sanchez* never addressed whether the trial court's failure to provide the defendant with a *Marsden* hearing could be deemed harmless. Rather, the *Sanchez* court automatically reversed the judgment and remanded the matter for a *Marsden* hearing without conducting a harmless error analysis.

17

The second cohort consists of courts which have found the failure of a trial court to conduct a *Marsden* hearing harmless beyond a reasonable doubt because the trial record provided an adequate basis for the court to independently determine that the defendant's contentions of inadequacy of trial counsel failed on the merits. (*People v. Mack* (1995) 38 Cal.App.4th 1484, 1487-1489 [Failure to hold *Marsden* hearing harmless where trial record does not support trial counsel's purported inadequate performance.]; *People v. Washington* (1994) 27 Cal.App.4th 940, 944 [Failure to hold *Marsden* hearing harmless where only basis for motion could have been counsel's incompetence and trial record reflected counsel had performed adequately.].)

Notwithstanding the aforementioned cases, the bulk of appellate cases addressing situations in which a trial court erroneously failed to provide the defendant a *Marsden* hearing have found the error required reversal and remand for a *Marsden* hearing. (*People v. Reed* (2010) 183 Cal.App.4th 1137, 1148-1149 [Where it remains possible that upon further inquiry by the court the defendant could have shown ineffective assistance of counsel, error in failing to hold *Marsden* hearing cannot be held harmless.]; *People v. Lopez, supra,* 168 Cal.App.4th at p. 815 [Court's failure to hold *Marsden* hearing was not harmless and required reversal and remand even where review of trial record reflected no ineffective assistance of counsel and trial was error free, but where defendant had raised an issue of conflict of interest between he and his counsel.]; *People v. Mendez* (2008) 161 Cal.App.4th 1362, 1365-1368 (*Mendez*) [Trial court's failure to hold *Marsden* hearing, appointment of new counsel to conduct an inquiry whether there was a basis for a new trial motion on incompetency of counsel, acquiescence to new counsel's assertion there

18

was no claim of ineffective assistance of counsel, and reappointment of original counsel was not harmless, requiring reversal and remand for *Marsden* hearing.]; *People v. Mejia* (2008) 159 Cal.App.4th 1081, 1086 (*Mejia*) [Error in failing to hold *Marsden* hearing not harmless where defendant instructed his counsel to move for a new trial based on counsel's ineffective assistance at trial.]; *People v. Eastman* (2007) 146 Cal.App.4th 688, 695-698 (*Eastman*) [Court's error in failing to hold a *Marsden* hearing after the defendant wrote the court asserting defense counsel had performed inadequately, court appointed counsel to investigate complaints and to file motion to withdraw, and substitute counsel did not file a motion to withdraw, required reversal and remand.];[9] *People v. Solorzano* (2005) 126 Cal.App.4th 1063, 1070 [Court's error in holding *Marsden* hearing when the defendant first expressed a request for substitute counsel was not rendered harmless or moot by its holding of another hearing a week later with a different attorney representing the defendant.].)

Here, the court never afforded defendant a *Marsden* hearing. (*People v. Solorzano, supra,* 126 Cal.App.4th at p. 1070 [Declining the People's invitation to treat one type of motion hearing as the functional equivalent of another within the context of a defendant's *Marsden* request.].) Although defendant was given the opportunity to

---

**9** *Mendez*, *Mejia*, and *Eastman* were all disapproved of by *Sanchez, supra,* 53 Cal.4th at page 90, footnote 3, to the extent they suggested the court's duty to hold a *Marsden* hearing could be triggered by something less than a clear indication by the defendant or his counsel that the defendant wanted a substitute attorney. However, *Sanchez* did not disapprove of the result in those cases. Thus, their holdings with respect to the application of the harmless error doctrine in denial of *Marsden* hearing cases remains good law.

address the court at the hearing on the "motion" to withdraw the plea, defendant was not asked whether he wanted substitute counsel either before or at the time of the hearing. Rather, defendant's communication with the court was addressed solely to the issue of why he wanted to withdraw the plea. This was not the functional equivalent of a *Marsden* hearing. No published case has held that a hearing on a motion to withdraw a plea may substitute for a *Marsden* motion.

Moreover, at the hearing on the motion to withdraw the plea, defendant did refer to the inadequacy of his counsel's performance; defendant said that because of his plea, he could not appeal his case. This was the very basis which initiated the appointment of substitute counsel because defendant's prior counsel had conceded she had incorrectly informed him he would have the right to appeal the denial of his motions in limine even if he pled guilty. This was the basis upon which defendant originally wished to withdraw his plea.

Finally, this is not a case in which we can simply find the error harmless because the record establishes that counsel performed adequately. On the contrary, defense counsel herself admitted she had performed ineffectively in advising defendant he could appeal the denial of his motions in limine even if he pled guilty. The court then asked defendant if he wanted to withdraw his plea; defendant responded that he did, insinuating counsel's misadvisement, the only reason proffered at the time, was the basis for his desire to withdraw the plea. Defendant reiterated this basis for withdrawing the plea when afforded the opportunity to address the court at the hearing on the motion to withdraw the plea. Thus, the court's failure to hold a *Marsden* hearing in the instant case

20

is not harmless beyond a reasonable doubt. Therefore, the trial court erred in following the disapproved procedure of appointing substitute counsel rather than immediately holding a *Marsden* hearing for the potential appointment of substitute counsel for the remainder of the criminal proceedings.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions that "'(1) the court shall hold a hearing on [defendant]'s *Marsden* motion concerning his representation by the public defender's office; (2) if the court finds that [defendant] has shown that a failure to replace his appointed attorney would substantially impair his right to assistance of counsel, the court shall appoint new counsel to represent him and shall entertain such applications as newly appointed counsel may make; and (3) if newly appointed counsel makes no motions, any motions made are denied, or [defendant]'s *Marsden* motion is denied, the court shall reinstate the judgment.'" (*Sanchez, supra,* 53 Cal.4th at pp. 92-93.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.