Filed 8/21/14  P. v. Sutherland CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B249669 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA087284) |
| v. | |
| DAVID SUTHERLAND et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Candace Beason, Judge.  Affirmed in part, modified in part, and conditionally reversed in part and remanded.

Maureen L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant David Sutherland.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Maurice Gibbs.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

David Sutherland and Maurice Gibbs appeal from their convictions on four counts of residential burglary, contending that: (1) evidence from the traffic stop that led to their arrest should have been suppressed; (2) certain terms of their probation were unconstitutionally vague; and (3) certain fines were improperly imposed. Gibbs also contends that the trial court erred by denying without a hearing his *Marsden*[1] motion to replace his appointed lawyer. We affirm as to the traffic stop evidence, but modify the judgment as to the fines and some of the probation terms. Based on respondent's concession, however, we conditionally reverse the judgment as to Gibbs and direct the trial court to conduct a posttrial hearing on Gibbs's *Marsden* motion and then determine whether to order a new trial or reinstate the judgment.

## FACTS AND PROCEDURAL HISTORY

A tip by a suspicious neighbor led Alhambra police to stop a car driven by Maurice Gibbs, leading to four burglary convictions each against Gibbs and his passengers, David Sutherland and Tony Banks, after a search of that car uncovered property stolen from several nearby homes earlier that day. The tipster neighbor identified Sutherland and Banks as the two men she saw casing her neighbor's house. A shoeprint found outside one of the burgled homes was a close match to the shoes Banks was wearing. After being questioned by the police, Sutherland wrote an apology for his part in the break-ins.

The primary issue on appeal concerns the trial court's denial of Sutherland's and Gibbs's motions to suppress all the evidence obtained or derived from the traffic stop and search of Gibbs's car.[2] Corporal Art Fernandez of the Alhambra Police Department testified that at around 10:48 a.m. on August 28, 2012, he was dispatched to the home of

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118, 123 (defendant has right to discharge ineffective appointed counsel).

[2] Banks also filed a motion to suppress the evidence but he is not a party to this appeal. Sutherland and Gibbs have joined in each other's appellate arguments and we will refer to them collectively as appellants.

2

Marcella R. on South Hidalgo Avenue after she reported suspicious activity at the home of her neighbor across the street. Marcella told Fernandez that she was unloading groceries from her car when she saw a car occupied by three African-American men stop in front of her Asian neighbor's house. The two passengers got out and walked down the neighbor's driveway and the car drove off. Marcella entered her house but went back out a few minutes later. She heard the neighbor's dogs bark and saw the same two men walk back down the driveway, where they were picked up by the car that had dropped them off. Marcella described the car as a light colored sedan that was like a Ford Taurus. One of the men who walked down the driveway had a beanie or doo-rag on his head.

Fernandez checked the neighbor's house and determined that no break-in had occurred. He knew that several residential burglaries had occurred in the area that involved a car dropping off and then retrieving passengers. Fernandez drove off and began looking for the car Marcella had seen. After about 15 minutes he saw three African-American men drive by in a silver Pontiac Grand Prix just three blocks from Marcella's house. The back seat passenger of that car wore a doo-rag or skull cap.

Fernandez called for back up and pulled over the Grand Prix. Gibbs was the driver, Sutherland was the front seat passenger, and Banks was in the back seat behind Sutherland. Fernandez asked to see Gibbs's driver's license, registration, and proof of insurance. Gibbs was unable to provide those documents, and Fernandez had him step out of the car. Gibbs told Fernandez that the car was his and that he had no driver's license. Fernandez patted down Gibbs because Gibbs wore baggy clothing and Fernandez wanted to see if Gibbs had any weapons. Fernandez felt a soft object that did not appear to be a weapon, but did ask Gibbs if he could see it. Fernandez removed the object, which turned out to be a single cloth glove. Fernandez questioned Gibbs for several minutes and then had Gibbs sit on the curb and went back to the car to speak with Sutherland.

When Sutherland told Fernandez that he had no driver's license or I.D., Fernandez asked him to step out of the car. Fernandez patted down Sutherland for weapons. Sutherland was wearing two pairs of shorts, one over the other, and a pocket of the inner

3

pair was full of loose change. When Fernandez asked what was inside the pocket, Sutherland said they were coins and that he was a coin collector. Fernandez removed the coins from Sutherland's pocket after asking if he could do so. Fernandez questioned Sutherland for several minutes and then had him sit on the curb and returned to the car to talk to Banks.

Banks said he had no driver's license and Fernandez asked him to step out of the car. A pat down search showed that Banks was wearing two pairs of pants. Inside a pocket of the inner pair were a single knit glove and a large amount of currency. Fernandez questioned Banks for several minutes and had him sit on the curb. The three suspects had not yet been handcuffed.

One of the officers who arrived as back up for Fernandez was Sigfredo Villegas. Right after Gibbs had exited the car Villegas saw that backseat passenger Banks was fidgeting nervously and turned to his left as if he were concealing something. After all three suspects were on the curb, Villegas wanted to search the backseat area of the car for either contraband or weapons based on Banks's furtive movements. However, Gibbs had just given Fernandez permission to search the car and both officers took part in doing so.

A screwdriver blade was on the rear seat beneath three jackets. A cell phone, ear buds, and $20 were on the floor. The officers opened a panel on the rear seat backs that allowed access to the trunk. Inside the trunk were a laptop computer, an IPod, a power cord, a camera, a glove that matched the one found on Banks, and several bank statements belonging to a man who later reported that his home had been burgled that day. The officers also found a shaving kit pouch containing coins, credit cards, and the driver's license of another burglary victim.

After the car was searched, Officer Villegas asked Sutherland about the coins found in the shaving kit. Sutherland instead removed the coins from his pocket, handed them to Villegas, and said he would not lie and that he had stolen the coins when he was 17. A few minutes later, Sutherland asked to speak to Villegas and admitted that he had

4

taken them from a nearby house.  Sutherland had not yet been read his *Miranda*[3] rights, and Villegas read him those rights soon after.

Five hours later, after being arrested and booked at the police station, Officer Corey Fukumoto asked Sutherland if he remembered his *Miranda* rights from Villegas's earlier advisement.  Sutherland said he did and Fukumoto questioned Sutherland further.  At the end of that session, Fukumoto asked Sutherland if he wanted to write a letter of apology.  Sutherland said he did.  Fukumoto gave Sutherland paper and pen and left the room.  Sutherland then wrote a letter apologizing for his actions.

The trial court held that the traffic stop was lawful and that the search of the car was properly conducted with Gibbs's consent.  The trial court found that the weapons pat down searches were lawful but that Officer Fernandez went too far in searching appellants' pockets once he determined the items he touched were not weapons.  As a result, the consent to search the pockets was not voluntary and the gloves and coins found in appellants' pockets were excluded from evidence.  Sutherland's oral apology concerning the coins was also suppressed, but his written apology was later allowed in evidence.

Appellants contend that none of the evidence derived from the search of Gibbs's car, including Banks's shoe print and Sutherland's written apology, should have been admitted in evidence because:  (1) the traffic stop itself was illegal; (2) even if the stop was legal, the detention was impermissibly long and went too far, especially in light of the illegal search of appellants' pockets; and (3)  Sutherland's apology letter was not just the product of an illegal search but was also obtained in violation of *Miranda*.

---

**3**     *Miranda v. Arizona* (1966) 384 U.S. 436.

**DISCUSSION**

1. *The Trial Court Did Not Err By Partially Granting the Motion to Suppress Evidence*

    A.    <u>Standard of Review</u>

When a trial court rules on a motion to suppress evidence, it finds the facts, selects the rule of law, and applies that rule to determine whether the law has been violated. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.) We review the trial court's factual findings under the substantial evidence standard. Whether the applicable law was correctly applied to those facts presents a mixed question of law and fact that is subject to independent review. (*Ibid.*) We review the ruling itself, not the trial court's reasoning, and will affirm if the ruling is correct on any applicable legal theory. (*Ibid.*)

    B.    <u>The Traffic Stop Was Lawful</u>

Although the police must have probable cause to arrest a person – a reasonable belief that the person has committed a crime – a lower standard applies when the police temporarily detain someone they reasonably suspect has been involved in criminal activity. (*People v. Celis* (2004) 33 Cal.4th 667, 673-674 (*Celis*).) Reasonable suspicion can arise from information less reliable than that required for probable cause. (*People v. Leath* (2013) 217 Cal.App.4th 344, 354 (*Leath*).) In order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that the person he is detaining is involved in criminal activity that has occurred or is about to occur. (*Ibid.*)

The courts look at the totality of the circumstances of the case to determine whether the officer had a particularized and objective basis for suspecting criminal activity. The police are allowed to draw on their own experience and specialized training to make inferences and form deductions about the information available to them that might not arouse suspicions in others. (*Leath, supra*, 217 Cal.App.4th at p. 354.)

6

Appellants contend the initial traffic stop was unlawful because the facts known to the police did not give rise to a reasonable suspicion that appellants were involved in criminal activity. According to appellants, tipster Marcella saw nothing more than two men being dropped off and picked back up after walking down her neighbor's driveway. The fact that those men were African-American and the neighbors were Asian was not a suspicious circumstance, they contend, and to hold otherwise would countenance an impermissible inference based on race. Furthermore, Fernandez inspected the neighbors' house and determined that no break in had occurred. Finally, appellants also point to differing accounts about the make and color of Gibbs's car and the type of headwear worn by Banks as undercutting any claim that Officer Fernandez could reasonably suspect them of criminal activity.

Appellants rely on *In re Tony C.* (1978) 21 Cal.3d 888 (*Tony C.*) and *People v. Durazo* (2004) 124 Cal.App.4th 728 (*Durazo*). Each is distinguishable. In *Durazo,* a college student reported a telephonic threat by unknown Mexican gang members, who said they would come to his apartment the next morning. Four days later, a police officer stopped a car driven by two Hispanic males who had looked in the direction of the student's apartment. A search of the car turned up a loaded pistol, leading to the defendant's arrest. Those facts were held insufficient to justify the traffic stop. (*Durazo*, at pp. 735-738.) The police in *Tony C.* stopped two teenage African-American males walking down the street during a school day lunch hour. The stop led officers to connect one of the boys with the receipt of stolen property. The justification for the stop was the officers' knowledge that three African-American men were wanted in connection with several nearby burglaries. Because nothing in the youths' conduct suggested a connection to criminal activity, the stop was held to be unlawful. (*Tony C.*, at pp. 896-897.)

In *Durazo*, the police had no description to go on and stopped two Hispanic men four days after the confrontation was supposed to have occurred for doing nothing more than looking in the direction of the victim's apartment. In *Tony C.*, the police had no description of the burglary suspects and the youths they stopped were innocently walking

down the street.  Missing from both cases are the elements of immediacy and identification, both of which are present here.

In our case, Officer Fernandez knew that Marcella's neighborhood had seen a rash of burglaries that involved thieves being dropped off outside a house and then picked up later.  Marcella reported seeing two men dropped off at her neighbors' house, hearing her neighbors' dogs bark, and then seeing the same men walk back down the driveway and get picked up within minutes.  Even though no break in had occurred, Fernandez could reasonably suspect that the men had been casing the house and left because they had been scared off by the dogs.

Regardless of whether Marcella's suspicions were aroused in part because the men she saw were African-American, because their conduct matched that of other burglaries, Fernandez was justified in being on the lookout for three African-American men driving a car that squared with Marcella's description.  Fernandez spotted appellants and Banks 15 minutes later and less than three blocks away.  Although the car was not a perfect match, those minor discrepancies were overridden by the fact that Banks was wearing a skull cap or doo-rag similar to what Marcella had seen.  We therefore hold that the traffic stop was legal.  (See *Leath, supra*, 217 Cal.App.4th at pp. 348-349, 354 [detention legal where officer learned that two African-American men driving dark SUV robbed victims at gunpoint and shouted out gang name before driving off; African-American defendant stopped when officer saw him walk away from hastily parked SUV a few blocks away in territory belonging to the gang whose name was called out].)

C.      The Detention's Length and Scope Were Also Lawful

An investigative detention must be temporary and last only as long as needed to carry out the purpose of the stop.  (*Celis, supra*, 33 Cal.4th at p. 674.)  Whether a detention met this goal turns on the duration, scope, and purpose of the stop.  (*Id.* at p. 675.)  The length of the encounter is an important factor in determining whether the seizure was so minimally intrusive that it was justifiable based on reasonable suspicion.  (*Ibid.*)  At bottom, we examine whether the officers' actions went beyond what was

necessary to quickly dispel or confirm their suspicions of criminal activity. (*Id.* at pp. 675-676.)

Appellants contend that even if the traffic stop was proper, their detention was either unlawfully long or became unlawful at the point that Fernandez improperly searched their pockets. We disagree.

Fernandez estimated that the detention lasted from 30 to 45 minutes. He testified that he first spoke with Gibbs for about five minutes in order to obtain his driver's license, registration and proof of insurance. After Gibbs was unable to produce those documents, Fernandez spent another five to 10 minutes patting down Gibbs and asking him further questions.[4] Fernandez spent about eight minutes with Sutherland to ask for identification, pat him down, and ask some questions. The officer then spent five minutes patting down and questioning Banks. This adds up to no more than 28 minutes, which we do not consider an unreasonable length of time to separately question three potential burglary suspects. It is unclear how long it took Fernandez to ask the suspects whether he could search their pockets and then do so, but it is reasonable to infer that doing so did not extend the length of the detention by more than a few minutes.[5] We therefore hold that the actual length of the detention was not excessive.

---

[4]    Gibbs points to a booking report showing he had a California driver's license as further proof that the detention was unlawfully prolonged, but that fact does not negate Fernandez's testimony that Gibbs did not produce a license when asked. Neither does it show that the license was Gibbs's. Gibbs also relies on the arrest report, which states that he was unable to produce proof of insurance and does not mention the failure to produce a driver's license. This too was a factual conflict that the trial court resolved against him.

[5]    In this section we consider only the actual length of the detention. In the following section we consider the legal effect of the fact that the pocket searches were found to be unlawful.

D.    The Unlawful Pocket Searches Did Not Require Exclusion of the Car's Contents or Banks's Shoe Print[6]

A lawful traffic stop exceeds constitutional bounds when it is extended beyond what is reasonably necessary under the circumstances that first justified the stop.  (*People v. Medina* (2003) 110 Cal.App.4th 171, 176 (*Medina*).)  Based on this, appellants contend that Fernandez's unlawful search of their pockets required suppression of the items found in the car and Banks's shoe print for two reasons:  (1)  the detention became unlawful from that point, and the incriminating evidence was not discovered until later; and (2)  it tainted and therefore invalidated Gibbs's subsequent consent to search his car.[7]

Resolution of this issue turns on our application of the "fruit of the poisonous tree" doctrine, which excludes evidence obtained as a result of an illegal search unless that evidence was seized independently of the illegality.  (*Medina, supra*, 110 Cal.App.4th at p. 178.)  Under this doctrine, evidence obtained in connection with an illegal search will not be excluded if it was not discovered by exploiting the illegality and was instead the result of circumstances sufficiently distinguishable from the illegality that the primary taint has been purged.  (*Ibid.*)  The degree of attenuation needed to dissipate the taint requires an intervening independent act by the defendant or a third party that breaks the causal chain between the incriminating evidence and the illegal search.  (*Ibid.*)

Gibbs's consent to search the car – if valid – provides the required break in the chain of events from the unlawful pocket searches.  (*People v. Oldham* (2000) 81 Cal.App.4th 1, 9 [a warrantless search made with consent does not violate the Fourth Amendment]; *U.S. v. Mosley* (3d Cir. 2006) 454 F.3d 249, 252-253 [although passengers generally lack standing to challenge vehicle searches, they may challenge evidence

---

[6]    We exclude from this portion of our analysis the admissibility of Sutherland's written apology, which we discuss in section 1.E., *post.*

[7]    We observe that the trial court:  (1) excluded evidence of the coins and gloves found in appellants' pockets after finding that the consent to search their pockets was invalid; and (2) at some other point excluded evidence of the oral apology Sutherland gave after being asked about the coins found in the trunk of Gibbs's car.  Respondent does not contest those rulings.

obtained from unlawful traffic stop]; accord *Brendlin v. California* (2007) 551 U.S. 249, 256-257 [vehicle passengers may challenge the lawfulness of a traffic stop]; *U.S. v. Cortez-Galaviz* (10th Cir. 2007) 495 F.3d 1203, 1206, fn. 3 [same].)

To determine whether Gibbs's consent was tainted by the unlawful pocket searches, we look to four factors:  (1)  the time gap between the illegality and the consent; (2)  the presence of intervening circumstances; (3)  the purpose and flagrancy of the official misconduct; and (4)  whether *Miranda* warnings were given before consent was obtained  (*U.S. v. Patzer* (9th Cir. 2002) 277 F.3d 1080, 1084.)

Appellants cite *U.S. v. Yousif* (8th Cir. 2002) 308 F.3d 820 (*Yousif*) and *U.S. v. Valdez* (11th Cir. 1991) 931 F.2d 1448 (*Valdez*) to support their contention that the taint from the illegal pocket search had not been purged when Gibbs consented to the search of his car.  Both are distinguishable.  The defendants in *Yousif* pulled off the highway in response to an illegal police ruse that involved warning signs about an upcoming drug checkpoint when the checkpoint was in fact located where motorists would leave the highway in order to avoid that checkpoint.  The police officer who questioned Yousif noticed a strong raspberry odor and asked why he had left the highway at that point. Yousif's wife said they did so to walk their dog.  The officer asked Yousif if he had any illegal drugs in the car and Yousif said he did not.  The officer asked if Yousif would consent to a search.  The wife asked if a warrant was needed and the officer said he could search with consent or if he had probable cause.  Yousif then consented to the search. The Eighth Circuit held that the traffic stop was the result of an illegal ruse and that the taint from that ruse was not purged by Yousif's consent because:  (1)  little time elapsed between the detention and consent; (2)  the officer's statement that he could search if he had probable cause indicated that he would search the car even without consent; and (3)  Yousif found himself in the presence of patrol cars, numerous uniformed officers, and patrol dogs.  (*Yousif*, at p. 831.)

The defendant in *Valdez, supra*, 931 F.2d 1448 was the subject of an illegal and pretextual traffic stop as part of a stake-out of suspected drug dealers.  He was asked for consent to search immediately after being asked for his driver's license, and was told he

11

did not have to consent. Even so, given the lack of any appreciable time to consider whether or not to consent, and because the officers had no reason connected with the traffic stop itself to ask for consent, the Eleventh Circuit held that the taint from the illegal stop had not been purged. (*Id.* at p. 1452.)

The facts here are significantly different. Appellants were detained as part of a lawful traffic stop. Officer Fernandez asked Gibbs for consent to search when he was done questioning all three suspects. According to Fernandez's time estimates, that occurred from 15 to 20 minutes after the unlawful extended pat down search of Gibbs. In the interim, Gibbs was sitting on the curb. He had not been handcuffed and the officers had not drawn their guns. We recognize that the trial court found appellants' consent to the pocket searches was not voluntary under the circumstances, and it is an evidentiary factor that we consider. However, Fernandez did ask for consent instead of simply reaching into their pockets and we do not believe this qualifies as flagrant misconduct. Furthermore, it suggested that he would not act without first obtaining their consent. Fernandez was never asked whether he read Gibbs his *Miranda* rights before asking for permission to search the car, or whether he told Gibbs he could refuse to consent. The absence of such evidence is not dispositive, however. (*People v. Monterroso* (2004) 34 Cal.4th 743, 758.) Neither is the fact that Gibbs had been detained for some period of time under the watchful eye of several officers. (*U.S. v. Watson* (1976) 423 U.S. 411, 424-425 [consent voluntary even though defendant was actually handcuffed and under arrest]; *Monterros*, at p. 758; *People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1559.) Finally, the trial court excluded the items found in appellants' pockets.

The only evidence the trial court had apart from the timing and the circumstances was Fernandez's testimony that he asked for permission and that Gibbs replied, "Go ahead." Based on this the trial court found that nothing was said to suggest to Gibbs that he was not free to decline consent and that Gibbs "readily agreed" to do so. Under the circumstances, given the deference we must show to the trial court's factual findings (*Monterroso, supra*, 34 Cal.4th at p. 758), we hold that Gibbs voluntarily consented to the search of the vehicle.

12

E.       There Was No Error In Admitting Sutherland's Apology

Sutherland contends that his written apology was obtained in violation of both his Fourth and Fifth Amendment rights because it was the product of his illegal detention and because he did not receive proper *Miranda* warnings before his interrogation began.

In regard to his Fourth Amendment claim, to the extent Sutherland contends the traffic stop itself was illegal, we have already rejected that claim.  To the extent he contends it was the product of the unlawful search of his pockets, the later written apology was admissible so long as the prosecution shows it was not caused by the earlier unlawful search.  (*People v. Storm* (2002) 28 Cal.4th 1007, 1028.)  We believe the prosecution met that burden.

The unlawful pocket search was conducted by Officer Fernandez about halfway through the 30 minute detention.  Sutherland verbally apologized about 15 minutes later after Officer Villegas discovered coins in the trunk of Gibbs's car and asked Sutherland about those coins.  Sutherland was read his *Miranda* rights after making that statement.  Five hours later, after being booked, Sutherland was asked if he recalled his *Miranda* rights, and being questioned further, he agreed to write out an apology for his actions.

These facts remove this case from the two cited by appellants:  *Taylor v. Alabama* (1982) 457 U.S. 687, and *Brown v. Illinois* (1975) 422 U.S. 590.  In both cases the police arrested the defendants without probable cause, essentially as a pretext to investigate and see if "something might turn up." (*Taylor* at pp. 690-691.)  Even though there were delays of several hours between the arrest and the confession and he was read his *Miranda* rights three times, the defendant in *Taylor* was in custody, questioned several times, fingerprinted, and subjected to a lineup.  As a result, the confession was the product of the illegal seizure.  (*Id.* at p. 691.)

As for Sutherland's *Miranda* claim, he contends it amounted to a two-step interrogation process of the type prohibited under *Missouri v. Seibert* (2004) 542 U.S. 600 (*Siebert*) where incriminating statements are elicited without a *Miranda* warning and then used as the basis to have the defendant repeat those statements after being given his

13

*Miranda* warnings. Our courts have held that the *Siebert* rule does not apply when there is no evidence that the interrogating officers deliberately used such a process to circumvent *Miranda* pursuant to departmental policy. (*People v. Scott* (2011) 52 Cal.4th 452, 478; *People v. Williams* (2010) 49 Cal.4th 405, 448; *People v. Camino* (2010) 188 Cal.App.4th 1359, 1364.)

We first note that appellants do not contend on appeal that *Miranda* was violated because Sutherland was interrogated five hours after being informed of his *Miranda* rights and was simply asked whether he recalled those rights. There is no evidence that the officers consciously sought to undermine Sutherland's *Miranda* rights or that they did so pursuant to a department policy or interrogation tactic. After being questioned for approximately 45 minutes Sutherland agreed to write out an apology for his actions and did so while left alone in the interrogation room. We therefore hold that *Siebert* does not apply here.

Finally, assuming for the sake of argument that Sutherland's Fourth and Fifth Amendment rights were violated by introduction of the written apology, we will not reverse if the error was harmless beyond a reasonable doubt. (*People v. Neal* (2003) 31 Cal.4th 63, 86.) Marcella identified Sutherland and Banks as the two men she saw walking down her neighbor's driveway. Based on her tip, the police stopped a car driven by Gibbs, in which Sutherland and Banks were passengers. Property stolen from nearby homes was found in the trunk of Gibbs's car. A shoe print that was a close match with Banks's shoes was found outside the window of one burglary victim. Even without Sutherland's apology, the evidence against appellants was overwhelming. We therefore hold that any error in admitting Sutherland's written apology was harmless beyond a reasonable doubt.

2.     *The Probation Conditions Must Be Modified*

The trial court sentenced both Gibbs and Sutherland to serve seven years and four months in state prison, and then suspended those sentences and placed appellants on five years formal probation. The probation order included several conditions: (1) stay away

14

from all the victims in this case; (2) not to own, use, or possess dangerous or deadly weapons, including firearms, knives, and other concealable weapons; (3) not to own, use, possess, buy or sell any controlled substances or drug paraphernalia except with a prescription; (4) to stay away from places where drug users, buyers, or sellers congregate; and (5) not to associate with persons known by you to be controlled substances users or sellers except in an authorized treatment program.

Appellants contend the first four conditions are unconstitutionally vague because they do not include a requirement that the violations be knowing. They contend that the two stay away orders – applicable to the victims and places where drug users and sellers congregate – are also unconstitutionally vague because they do not include a distance requirement. (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*) [a probation condition is unconstitutionally vague if it is not sufficiently precise for the probationer to know what is required of him and for the court to determine whether the condition has been violated].)

Respondent concedes that a distance limit is required and agrees that appellants' suggestions of a 100 foot limit as to the victims and a 50 foot limit as to places where drug users and sellers congregate is appropriate. (See *People v. Barajas* (2011) 198 Cal.App.4th 748, 760-762.) We will order that the probation conditions be modified accordingly.

Respondent contends that formal modification to include the knowledge requirement is unnecessary because it is implied by law. Various courts of appeal have adopted different procedures for effecting *Sheena K.*'s constitutional requirement. In *In re Patel* (2011) 196 Cal.App.4th 956, 960, the Third District expressed impatience with the fact that probation terms have continued to omit required scienter requirements in the face of 20 years of jurisprudence on the subject. The remedy it suggested was to assume in all cases that knowledge was implied, and if that were not sufficient, appellate counsel could apply to the trial court for modification. (*Id.* at pp. 960-961 & fn. 4.) The court stated that it was now giving "notice of our intent to henceforth no longer entertain this

15

issue on appeal, whether at the request of counsel or on our own initiative." (*Id.* at p. 960.)

A few months after Patel, the Fourth District took a different tack on the proper remedy for the failure to include a constitutionally required knowledge requirement. In *People v. Moses* (2011) 199 Cal.App.4th 374, 381, the court acknowledged Patel but held it would "instead choose to modify and strike certain challenged probations conditions." It also stated "that the superior court should revise its standard probation conditions form to meet constitutional requirements." (*Ibid.*)

We need not to decide whether in all cases *Moses* or *Patel* is preferred. Here we are remanding for other reasons as well, so we direct the trial court to modify the terms of probation to include the distance and knowledge requirements as set forth above.

3.     *The Judgment Should Be Modified to Delete the Court Security and Criminal Conviction Assessment Fees as Conditions of Probation and Instead Treat Them as Separate Orders*

As conditions of probation the trial court imposed a $40 court security fee (Pen. Code, § 1465.8) and a $30 criminal conviction assessment fee (Gov. Code, § 70373). As appellants point out and respondent concedes, those fees may not be assessed as conditions of probation. (*People v. Kim* (2011) 193 Cal.App.4th 836, 842.) Instead of simply eliminating those fees as appellants request, however, the proper remedy is to delete them as probation conditions and enter them as separate orders. (*Id.* at p. 848.)

4.     *Gibbs Is Entitled to A New* Marsden *Hearing*

Criminal defendants represented by appointed counsel who believe they are receiving inadequate representation may seek appointment of new counsel pursuant to *Marsden, supra*, 2 Cal.3d 118. The trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. (*People v. Smith* (2003) 30 Cal.4th 581, 604.) The defendant is entitled to new counsel if the record clearly shows either inadequate representation or an irreconcilable conflict

16

with counsel that makes ineffective representation likely. (*Ibid.*) The motion may be made at any point in the trial. (*People v. Roldan* (2005) 35 Cal.4th 646, 681, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Gibbs brought a *Marsden* motion on April 25, 2013, that was denied following a hearing. He made another *Marsden* motion on May 8, 2013. In response, the trial court said: "This is not an appropriate time. I can't even imagine what is crossing our brain on this one. [Gibbs's lawyer], I reviewed – seen his performance and his abilities in this courtroom in this case and in other cases. And previously we've had things. I think it's a delaying tactic, and so the court is not even going to hear the motion."

Gibbs contends, and respondent concedes, that the trial court erred by summarily denying the motion. Gibbs contends this calls for outright reversal of the judgment. We disagree on straight reversal. Instead, the proper remedy is to reverse the judgment subject to the trial court conducting a *Marsden* hearing and then exercising its discretion to order a new trial, reinstate the judgment, or proceed as otherwise authorized by law. (*People v. Lopez* (2008) 168 Cal.App.4th 801, 815.)

## DISPOSITION

The judgment is modified as to Sutherland as to only the terms of his probation and the court security and criminal conviction assessment fees. The matter is remanded to the trial court with directions to eliminate the fees as conditions of probation and enter them as separate orders. The trial court must also modify the terms of probation to include the distance and knowledge requirements as set forth in our decision. The judgment as so modified is affirmed.

The judgment is reversed as to Gibbs for the sole purpose of conducting a new *Marsden* hearing, after which the trial court shall exercise its discretion to either order a new trial, reinstate the judgment, or proceed as otherwise authorized by law. If the trial court reinstates the judgment as to Gibbs, it shall modify the judgment to amend the terms of probation in regard to knowledge and distance as set forth in our decision and shall eliminate the court security and criminal conviction assessment fees as conditions of

probation and enter them as separate orders.  If that is the outcome, then the modified judgment is affirmed.



                                                RUBIN, J.

WE CONCUR:



        BIGELOW, P.J.



        GRIMES, J.


18