Filed 12/4/14  P. v. Mendez CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B250219 |
| Plaintiff and Respondent, | (Los Angeles County<br> Super. Ct. No. BA397964) |
| v. | |
| RAYMUNDO MENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  William N. Sterling, Judge.  Conditionally reversed and remanded.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James Williams Bilderback, II, and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Raymundo Mendez timely appeals from his conviction of one count of corporal injury to a spouse/cohabitant/child's parent and one count of criminal threats. He contends: (1) the trial court prejudicially erred by denying his pretrial *Marsden* motion[1]; (2) he was denied his constitutional right to effective assistance of counsel when counsel failed to present evidence that the complaining witness was improperly coached; and (3) the trial court prejudicially erred by failing to conduct a posttrial *Marsden* hearing. We conditionally reverse the judgment and direct the trial court to conduct a posttrial *Marsden* hearing to determine whether to appoint new counsel and conduct future appropriate proceedings, or to reinstate the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and A.V. met in 2005 and soon began living together. They held themselves out as an unmarried, romantic couple, and they shared their earned income to pay bills. In March 2006, A.V. had a son, D. In December 2006, defendant requested that the juvenile court order a DNA test to determine the paternity of D. The results of the DNA test revealed that defendant was not the biological father of D.

Upon receiving the DNA results sometime between December 2006 and January 2007, defendant became upset with A.V. and began to beat her. In January 2007, defendant again argued with A.V. about the DNA test. Defendant accused A.V. of cheating on him, held a knife to her throat, hit her with the blade of the knife, struck her in the face with his fist, covered her mouth with a sweater, and threatened to kill her. Eight days after the January 2007 attack, A.V. reported the incident to the police. Defendant was convicted in June 2007 of one count of corporal injury to a cohabitant/child's parent in violation of Penal Code section 273.5, subdivision (a) and one count of criminal threats in violation of Penal Code section 422, subdivision (a).[2] He was sentenced to five years formal probation. This

---

[1]    *People v. Marsden* (1970) 2 Cal.3d 118.

[2]    All undesignated statutory references are to the Penal Code.

conviction is not the one currently on appeal. We have included a summary of those proceedings to provide context.

In October 2011, A.V. lost custody of three of her five children and was ordered by the juvenile court to leave the home she shared with defendant.[3] Defendant retained custody of the three children, including D. A.V. vacated the home, but she and defendant continued to see each other as a couple and to have sexual relations. At the beginning of May 2012, A.V. ceased having sex with defendant but remained in regular contact with him.

On May 20, 2012, defendant appeared at the residence where A.V. rented a room. A.V. agreed to go for a walk in the park with defendant. While in the park, defendant and A.V. consensually held hands, hugged, and kissed. The defendant indicated he wanted to have sex, but A.V. refused and instead accompanied defendant to a bus stop. She returned home by herself.

That same evening, defendant called A.V. on the phone and asked A.V. to come to the house he shared with their three children. A.V. refused and terminated the call. Later, A.V. realized she had several "missed calls" from defendant. Around 10:30 p.m. or 11:00 p.m., defendant called A.V., who answered the phone and texted to defendant a photo of herself, in which she appeared only partially clothed.

During the second phone call, defendant insisted that A.V. come to his house and that if she refused, he "wouldn't be responsible for what could happen to the child." A.V. believed defendant was referring to D. A.V. agreed to go to defendant's house to make sure that D. was unharmed. A.V., who had been ready to go to sleep, took a taxi in her pajamas to defendant's house. She did not have her own car.

At defendant's house, defendant slapped and punched A.V.'s face, causing her nose to bleed, and called her a "bitch" and a "whore." A.V. claimed defendant forced her to disrobe and have sex on the floor of the room where the three children were sleeping. Defendant bit A.V.'s chest several times. Defendant warned A.V. that if a DNA test were performed on their youngest child, and the child was determined not to be defendant's, he would kill A.V. Defendant and A.V. went to sleep in separate rooms in the house.

---

[3]    A.V.'s two older children lived with their biological father.

3

On the morning of May 21, A.V.'s face showed bruises, discoloration, and other marks. Her chest was red and discolored. Later that morning, A.V. called her therapist but was unable to reach her. She took the bus to see the Los Angeles County Department of Children and Family Services social worker who was in charge of D.'s case. A.V. reported to the social worker that defendant had threatened to ask her to pay child support. A.V. did not report to the social worker the events of the evening of May 20. After A.V. left the social worker's office, she visited her therapist and reported to her the events of May 20. The therapist took A.V. to the Rampart Division of the Los Angeles Police Department, where A.V. reported the May 20 incident. The police took photographs of A.V.'s face and chest.

Defendant was arrested on May 21. He was charged with one count of rape under section 261, subdivision (a)(2), one count of corporal injury to a spouse/cohabitant/child's parent, and one count of criminal threats. One prior strike, prior serious felony, and prior prison terms were also alleged pursuant to section 667, subdivisions (b)-(i); section 1170.12, subdivisions (a)-(d); section 667, subdivision (a); and section 667.5, subdivision (b).

At a pretrial hearing, defendant requested appointment of new counsel. The court denied the motion. The jury deadlocked as to the rape count, and defendant was found guilty of corporal injury and making criminal threats. Immediately after the verdict, defendant raised his hand in court and was permitted, against the advice of counsel, to address the court directly about several concerns he had about his counsel and the fairness of the trial. We will discuss more fully in Part 3, *post*, the circumstances of defendant's posttrial attempts to challenge the adequacy of his representation.

Approximately six weeks after the verdict, defendant admitted to the prior conviction allegations. He was sentenced to nine years on the criminal threats conviction, comprised of the two-year mid-term for section 422, subdivision (a), doubled for the strike, plus five years for the prior serious felony. The trial court stayed the sentence on the corporal injury conviction under section 654, struck the prior prison term enhancement, and granted the prosecution's motion to dismiss the rape count under section 1385.

4

**DISCUSSION**

*1.      Denial of the Pretrial* <u>Marsden</u> *Motion Was Proper*

One month *prior* to trial, defendant had requested appointment of new counsel pursuant to *People v. Marsden, supra,* 2 Cal.3d 118.  Defendant explained to the court that he did not want to go to trial with his counsel, stating, "I totally don't trust her . . . .  [¶] She's been on my case for approximately eight months, and she doesn't know my case.  She hasn't sent anybody to interview me to find out exactly what happened.  When I try to explain to her, she gets bothered, she's bothered, upset.  [¶]  All the time she's talking to me in a negative way, and she tells me I am not forcing you to take a deal after she gave me all the cons.  [¶][¶]  She tried to frighten me. . . .  She's always trying to postpone the case or continue the case for one reason or another."

Defendant went on to enumerate for the court several concerns he had about his counsel's approach to his case.  He indicated he wanted his counsel to call as witnesses his father, his father's wife, defendant's sister, and two of defendant's friends because they might be "helpful to [his] case."  He wanted counsel to introduce into evidence voice messages from A.V. that defendant felt demonstrated A.V. attempted to frighten him.  He stated, "[M]y attorney is saying [the messages] are from ten days before, they are not useful in my case.  [¶]  I've heard that people get convicted on messages that are dated a month before.  Why not use messages from ten days before to help me?"

At that point in the hearing, the court asked to hear from defense counsel, who began by providing the judge with the pertinent background regarding the open juvenile court case involving the children of defendant and A.V.  Counsel then explained that the reason for the delay in going to trial was so that she could seek permission from the juvenile court for the social worker in the juvenile case to testify for the defendant.  The social worker was to be the main witness for the defense, and counsel was unwilling to go to trial until she was available.[4]

Counsel went on to detail how she had had voicemail messages A.V. left on defendant's phone two weeks prior to the charged incident translated from Spanish and

---

[4]      When the social worker finally testified, she did so while on maternity leave.

5

transcribed by an expert. She explained to the court that she advised defendant that since the messages were not left by A.V. on the night of the incident, the day before, or the day after and did not involve the actual incident, they were not relevant. She assured the court that she informed defendant she would introduce the voicemails at trial if she deemed them relevant to demonstrate A.V.'s motive to fabricate her story and to show A.V.'s anger and bias toward defendant. Counsel had also subpoenaed several documents, phone records, and text messages between defendant and A.V. that she planned to introduce at trial.

Regarding the witnesses counsel was reticent to call to testify, counsel explained that defendant's father would be unable to rebut A.V.'s assertion that she was in defendant's house early on the morning after the incident because the father was not in the closed bedroom where A.V. had slept. Counsel feared the other witnesses, who would testify to the consensual nature of defendant and A.V.'s relationship in the *weeks* prior to the incident, would have to admit on cross-examination that the relationship between defendant and A.V. was also dysfunctional in the *months* prior to the incident. Counsel felt it was sufficient— and less dangerous to defendant's case—that A.V. had already admitted in the preliminary hearing that she and defendant had had a consensual relationship. Defendant was afforded the opportunity in the hearing to confirm that he had wanted the witnesses called for the purposes stated by counsel.

Counsel told the court she had attempted to interview A.V. and that A.V. would not speak with her. Counsel indicated she would not send an investigator to interview defendant's father because she felt it was within the purview of her job to conduct the interview herself. The court asked counsel directly if she had asked defendant what did or did not happen surrounding the charged incident and counsel indicated that, "absolutely," she had. She had also given defendant "a substantial amount" of the discovery that had been translated into Spanish, with the exception of the police reports because they were in English. She offered in court to provide the police reports to defendant. Defendant interjected at this point in the hearing that he had only received documents from his social worker, but counsel reiterated that she had provided defendant all translated documents. She explained that the day before the *Marsden* hearing, she and defendant spoke for an hour and were on good terms.

Regarding counsel's purported attempts to frighten defendant, counsel clarified for the court that she had advised defendant of the maximum penalties he faced. She informed him that if he were convicted of the rape charge, he would have to register as a sex offender for the rest of his life. She explained to him that he had a potential strike under the Three Strikes law, that "placing [his] fate in 12 people" was a risk, and that it was defendant's choice whether to accept any plea deal.

The judge reviewed and accepted into the record defendant's handwritten notes and denied defendant's motion for new counsel, stating that he was satisfied that counsel was "performing competently" in preparation for trial and that while defendant and counsel may have disagreed about tactical matters and which witnesses to call, the thrust of the case was the credibility of A.V. as the prosecution's main witness.

Defendant asserts on appeal that by the time of the pretrial *Marsden* motion, he and his counsel had become so embroiled in conflict that their differences were irreconcilable. He maintains that in light of these differences, the trial court's failure to appoint new counsel—with whom he would presumably have no conflict—violated his rights under the Sixth Amendment to a fair trial and to effective assistance of counsel. We disagree.

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees to indigent criminal defendants the right to assistance of counsel. (*Gideon v. Wainwright* (1963) 372 U.S. 335.) However, this does not entitle a criminal defendant to change attorneys at whim. " 'A defendant's right to court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . .' " (*Marsden*, *supra*, 2 Cal.3d at p. 123, citing *People v. Mitchell* (1960) 185 Cal.App.2d 507, 512.) When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden*, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Smith* (2003) 30 Cal.4th 581, 604 (*Smith I*).)

7

The standard of review for the denial of a *Marsden* motion is abuse of discretion. (*People v. Taylor* (2010) 48 Cal. 4th 574, 599.) Denial of a *Marsden* motion " 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 (*Barnett*).)

We see no evidence in the record that defendant's right to counsel was substantially impaired by the denial of his pretrial *Marsden* motion. Isolating the pretrial phase into the snapshot available to the court at the time of the hearing, it is difficult to see how the court could have determined that basic disagreement about counsel's approach to the case resulted in substantial impairment when counsel was well-versed in her client's case and set out a detailed defense strategy that revealed proactive advocacy. Differences of opinion about tactics notwithstanding, counsel appeared to be providing effective assistance. "There is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant. [Citations]." (*People v. Lucky* (1988) 45 Cal.3d 259, 281.) If subsequent events and outcome are any indication that the trial court here was correct, it is worth noting that counsel called critical witnesses, diligently cross-examined others, and adduced documentary and photograph evidence at trial that resulted in the People being unable to obtain a conviction on the most serious charge of rape.

We also conclude that procedurally the trial court conducted a proper *Marsden* motion. Before defendant addressed the trial court with his complaints, the court advised him that in order for counsel to be replaced, "her representation had to fall below the legal standard [expected] of a competent attorney or through no fault of your own, the attorney-client communication and relationship has disintegrated and that you're no longer effectively communicating." While the words are not identical to those used in *Marsden* and *Barnett*, the spirit is there. It is clear the court measured the statements by defendant and counsel against an adequate and accurate standard fully in line with *Marsden* and its progeny and came to the reasonable conclusion that counsel performed her duties with enough diligence to provide adequate assistance that was not substantially impaired. Accordingly, the trial court did not abuse its discretion when it denied the pretrial *Marsden* motion.

*2.      Defense Counsel's Tactical Decision Not to Challenge the Witness Coordinator's Courtroom Demeanor Was Not Ineffective Assistance*

During the evidentiary portion of the trial, after A.V. testified, counsel informed the court, outside the presence of the jury, that defendant wished to put on the record observations by defendant's sisters regarding the District Attorney's witness coordinator, who was present in court to support A.V. during her testimony. Counsel told the court that it appeared to defendant's sisters that the witness coordinator was coaching A.V. or otherwise improperly communicating with A.V. during her testimony by nodding his head. Defendant wanted counsel to call his sisters to testify before the jury as to what they had observed in order to undermine A.V.'s credibility.

The judge stated he faced the audience and had observed the coordinator and "never saw him make any kind of gesture at all. I wasn't looking at him constantly, but I was glancing back and forth, and I never saw anything. [¶] . . . [R]ight now, there's nothing I can do, and I didn't observe any of it. I have a clear memory of seeing that person in court, and he was just sitting there. [¶][¶] I never saw him do anything nor did I see anything in [A.V.]'s demeanor that would be indicative of her responding to any kind of coaching, but talk to the sister [sic] and see if you want to raise it further. [¶][¶] I had a chance to observe him. I had a chance to observe her. I saw nothing indicating she was being coached." The prosecutor offered that the coordinator might have been instructing A.V. that she could respond after the overruling of objections. The judge replied, "That person shouldn't be doing that at all. If that person was doing that, it's still inappropriate . . . ." The judge suggested defense counsel make any requests of the court she deemed necessary after interviewing the sisters.

After further testimony that morning, counsel interviewed defendant's sisters in the jury room. When court reconvened outside the presence of the jury, counsel reported to the court that both sisters believed the coordinator communicated with A.V. during her testimony by "nodding his head either in a sideways manner or an up and down manner." One of the sisters related that during a recess, she observed the coordinator talking to A.V. and overheard him say, "They didn't have proof to prove that." Later, near the courtroom

9

entrance, the same sister overheard the coordinator say to A.V., "You don't have to answer." The sister admitted she knew nothing of the context of the conversation between A.V. and the witness coordinator. The court gave counsel until after lunch to determine how she wanted to proceed.

After the lunch recess, and outside the presence of the jury, the prosecutor relayed to the court that he had spoken with the witness coordinator and disclosed the contents of that conversation to defense counsel. Defense counsel informed the court that she had stated her concerns for the record and had made the court aware of the issue and did not wish to pursue the matter any further. Defendant asserts that his constitutional right to effective assistance of counsel was violated when counsel failed to challenge before the jury the witness coordinator's courtroom behavior. We disagree.

"[A] violation of the right [to the effective assistance of counsel] has two components: [¶] 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " (*Williams v. Taylor* (2000) 529 U.S. 362, 390, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.]" (*Williams,* at pp. 390-391.)

Using *Strickland's* reasonableness standard, defendant's contentions fall short. On the one hand, absent more information about the context of what one of the sisters purported to overhear the coordinator say to A.V. or about what was communicated during lunch between the prosecutor and defense counsel regarding the witness coordinator, we cannot determine whether counsel's decision not to pursue the matter was so imprudent, it fell below an objective standard of reasonable performance by defense counsel or produced an unreliable and unjust result. If there were some evidence in the record that counsel was aware of defendant's concerns or had witnessed inappropriate behavior herself, and had not brought it to the trial court's attention, we might reach a different result. Counsel may have

10

thought that calling the sisters to challenge not A.V. but the witness coordinator suggested weakness in defendant's defense. Here, counsel addressed the matter before the court, investigated defendant's allegations, and made a tactical decision not to pursue the issue. The presumption, in such a circumstance, is that counsel acted prudently and in the best interest of her client. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)

We also observe that nothing in the record before us reveals with any certainty that any inappropriate behavior by the witness coordinator in fact transpired or what questions the alleged behavior related to. Thus, we cannot discern the significance of any conduct. The trial court was in the best position to observe whether the witness coordinator behaved in any way that could be deemed "coaching" of the witness. The court stated repeatedly that it observed nothing irregular or out of the ordinary. We find no reversible error in counsel's decision not to pursue purported irregularities surrounding the role of the witness coordinator.

*3.*      *The Trial Court Erred When It Did Not Conduct a Posttrial* Marsden *Hearing*

Defendant contends that when the trial court declined to hold *a posttrial Marsden* hearing, it too narrowly construed defendant's postverdict comments regarding his displeasure with his counsel's handling of the witness coordinator and the court thus failed to realize defendant was calling for another *Marsden* hearing. On appeal, he emphasizes the point that defense counsel at the time indicated that defendant may have been seeking a *Marsden* hearing. We conclude a hearing was in order.

To review, when a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden*, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance." (*Smith I, supra*, 30 Cal.4th p. 604.) This standard applies at every stage of the trial, including postverdict. (*People v. Smith* (1993) 6 Cal.4th 684, 694 (*Smith II*).) Immediately after the verdict, just moments after the jurors were excused, defendant raised his hand and asked to address the court even though it was against the advice of his counsel. The prosecutor was present.

11

Defendant stated, "Your Honor, with all due respect, I haven't been in agreement nor do I agree now with the position taken by my attorney on Wednesday regarding the person who was nodding with his head when [A.V.] was being questioned." Defendant indicated to the court that his counsel agreed with him that what the witness coordinator had done "was not legal nor was it right" but that she discouraged him and his sisters from pursuing the matter since the coordinator worked in the District Attorney's office and would be more believable than defendant's sisters. Defendant told the court that because his sisters were immigrants without "prestigious job[s]", they decided to "leave everything as is" for defendant's sake. Defendant went on to declare that his rights to a just, transparent, and legal trial had been violated and that when he explained this to counsel, "she told me to leave it alone. . . ."

Counsel interjected, "At this juncture, I don't know if this is getting on the verdict [sic] of a *Marsden* hearing. I may want this record sealed[,]" to which the court replied, "I don't think it has anything to do with a *Marsden*." The judge believed defendant wanted a new trial based on ineffective assistance of counsel and continued the proceedings in order to research whether he needed to appoint separate counsel to assist defendant in bringing the new-trial motion. At a subsequent hearing, the court determined that it need not appoint new counsel for the purpose of bringing the motion. It then denied what it viewed to be the motion for a new trial.

Defendant attempted, over the course of three posttrial hearings, to not only express general malcontent with his counsel and ultimately ask for a new trial, but to complain specifically about his counsel's performance regarding what he felt was her mishandling of the witness coordinator controversy. The trial court construed all of defendant's remarks to be a request for a new trial. At one point in the third hearing, the colloquy between defendant and the trial court about the quality of the representation became so argumentative, defendant expressed concern that he was upsetting the court, and the court observed that defendant was not in the proper emotional state to continue.

While defendant's request for a new trial may have shrouded his request for new counsel, his initial complaint posttrial addressed directly his dissatisfaction with counsel, and counsel expressly referenced *Marsden* in conjunction with defendant's complaints about her representation. This should have triggered a closed-session *Marsden* hearing. The court

12

appeared to use an either/or approach when examining defendant's assertions regarding his counsel. Rather than deeming defendant's expressed dissatisfaction both as a request for a new trial and a request for the appointment of new counsel, the trial court determined that the latter would simply be a tool to achieve the former and denied any appointment of new counsel without benefit of a *Marsden* hearing.

Respondent argues that defendant's claim that the trial court failed to hold an appropriate hearing is meritless since the trial court allowed counsel to respond to each of her client's complaints, but there can be no doubt that with the prosecutor present, not only was defendant's ability to speak freely compromised, so was counsel's, thereby undermining the trial court's ability to properly assess defendant's complaints. "The court must allow the defendant to express any specific complaints about the attorney and the attorney to respond accordingly. This is one of the reasons that *Marsden* motions are often . . . heard outside the presence of the prosecutor, where counsel and client may speak more freely." (*Smith II*, *supra*, 6 Cal.4th at p. 694.) In a closed *Marsden* hearing, defendant may have been able to effectively argue that even though the trial court found no basis to replace counsel during the pretrial phase, he and counsel really had become embroiled in irreconcilable differences based on counsel's handling of the witness coordinator issue such that the adequacy of the representation had been compromised by the time of posttrial. "A defendant is entitled to competent representation at all times[.]" (*Smith II*, at p. 695.) At a minimum, without the prosecutor present, the otherwise adversarial nature of the proceedings would have been absent, possibly allowing for a less contentious and confusing atmosphere to prevail and permitting defendant to more thoroughly address his claims for why new counsel should be appointed.

Accordingly, a conditional reversal is necessary. The remedy is to reverse the judgment and remand the matter with directions to the trial court to conduct a posttrial *Marsden* hearing and following that hearing exercise its discretion to: (1) grant the motion, appoint new counsel and permit defendant to make a new trial motion or otherwise proceed according to law; or (2) deny the motion and reinstate the judgment. (*People v. Lopez* (2008) 168 Cal.App.4th 801, 815.)

**DISPOSITION**

The judgment is reversed for the sole purpose of conducting a new *Marsden* hearing. Based on the court's ruling on the *Marsden* motion, the trial court shall exercise its discretion to:  (1) grant the motion, appoint new counsel and permit defendant to make a new trial motion or otherwise proceed according to law; or (2) deny the motion and reinstate the judgment.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

14